**PETROLEUM HEAT AND POWER CO., Inc.**

v.

**The UNITED STATES.**

**No. 80–67.**

United States Court of Claims.

Jan. 24, 1969.

Louis H. Shereff, New York City, attorney of record, for plaintiff.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant.

Before COWEN, Chief Judge, and DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.

Plaintiff, a New York corporation with its principal office in Stamford, Connecticut, brings this action for refund of corporate income taxes paid in 1963 and 1964 for the period July 1, 1962, to December 31, 1962. The case is now before us on the motions of the parties for summary judgment. For reasons herein expressed, we grant plaintiff's motion and deny defendant's. The stipulated facts pertinent to the decision are as follows:

Plaintiff corporation was organized in 1952 as successor to a corporation of the

same name which had carried on the same business as plaintiff for approximately 25 years. Although it had other interests, plaintiff's principal business was the sale of fuel oil at retail. As part of this business plaintiff entered into contracts with most of its fuel oil buyers under which plaintiff was to service its customers' oil burners. In 1962, most of these contracts were for an annual period beginning on July 1 of one year and ending on June 30 of the next, thereby coinciding with plaintiff's then July-to-June fiscal year.

The oil burner service contracts had always been performed by plaintiff and its predecessor at substantial losses. The contracts were used as sales devices to obtain fuel oil sales agreements, the sale of fuel oil being the means whereby plaintiff's profits were earned. Each of the burner service agreements required plaintiff to overhaul the oil burner during the contract year. In addition, plaintiff was obligated to provide emergency service, which plaintiff performed only upon demand.

The provisions of the contracts allowed cancellation. Contracts for domestic service could be canceled by either party upon 30 days' notice. The amount of any refund to the customer was arranged by negotiation based upon a minimum fee of $2 per month (for the availability of emergency service) for each month the contract was in effect, plus a charge of $12.50 if the burner had been overhauled prior to the date of cancellation. Contracts for industrial burner service provided for a minimum charge of $5.50 to $7.50 per month for each month the contract was in effect, plus a charge of $50 if the overhaul had been completed prior to termination. Under all the contracts, plaintiff could have terminated if the customer purchased fuel oil from another dealer or supplier or for unsatisfactory credit or nonpayment of a bill. As an historical fact, however, a contract was canceled only when the customer sold his building or buildings, and in most of these cases plaintiff attempted, usually with success, to have the new owner assume the contract. Thus, although there had been terminations and refunds, the cancellation rate was low.

The contracts did not specify a particular time during the 12-month period when the burners were to be overhauled. For the convenience of plaintiff and for the practical distribution of the work among its employees, the overhauls were started during the summer months. When the heating season began and emergency service calls were received, the overhauls were then performed with each emergency service call. As a result of this practice, approximately 50 percent of the overhauls were made during the first 6 months of plaintiff's July-to-June fiscal year, and half were made during the last 6 months of each fiscal year.

During the period in issue plaintiff used the accrual method of accounting in keeping its books and filing its income tax returns. It was plaintiff's practice to bill a customer for the full amount of the contract price upon the signing and receipt by it of the contract. In accordance with its method of accounting, therefore, receipts from the oil burner service contracts were put into a deferred income account. Income was deemed earned on the basis of one-twelfth of the contract price for each of the 12 months of the contract period. As expenses were incurred in the servicing of oil burners, they were charged to the deferred income account, thereby reducing the account by a like amount. Plaintiff closed its books at the end of every month and prepared monthly balance and operating statements.

The parties have stipulated that the method of accounting used by plaintiff was in accord with generally accepted commercial accounting principles under the accrual method of accounting as customarily employed by similar taxpayers. It is also agreed that plaintiff's income for any period of time ending with the last day of the month could be clearly and accurately determined for plaintiff's commercial purposes.

The occurrence which precipitated the present dispute was the sale by the shareholders of plaintiff of all their stock on January 10, 1963, to Signal Oil and Gas Company of Los Angeles, California. Plaintiff subsequently filed an income tax return pursuant to Treas. Reg. § 1.1502–13A(g) (1955) for the short period July 1, 1962, to December 31, 1962. This return was, in effect, a final return for the period of its fiscal year during which plaintiff was an independent corporation. Plaintiff paid taxes on the basis of this return in March and June of 1963 amounting to $73,944.75.

On January 15, 1964, the District Director of Internal Revenue, Hartford, Connecticut, assessed against plaintiff additional taxes and interest in the amount of $100,268.77, raising plaintiff's taxes for the 6-month period to a total of $174,213.52. Plaintiff paid that additional assessment on January 17, 1964.

Plaintiff had received $479,470 during the 6-month period July 1, 1962, to December 31, 1962, by virtue of customer billings for the oil burner service contracts. In accordance with its above-described accounting method, plaintiff had sought to defer part of the $479,470 income received to offset expenses to be incurred in the 6-month period January 1, 1963, to June 30, 1963. The amount in the deferred income account was $199,560.43.[1] The District Director disallowed the income deferral, and this gave rise to the additional assessment.

The tax deficiency, imposed at the rate of 52 percent, amounted to $103,771.42. Plaintiff duly filed a claim for refund of this sum, which was subsequently denied.[2]

This action is for refund of the amount of the assessed deficiency, plus interest. Plaintiff's primary position is that the regulations then in effect explicitly or implicitly required the Commissioner to accept plaintiff's statement of income as reflected in its books of account. Plaintiff also questions the constitutionality of the disallowance.

In the alternative, plaintiff argues that the Commissioner should have allowed at least the deferral of $97,413.09, and it seeks the tax it paid ($50,654.81) attributable to that amount, plus interest. Plaintiff asserts that, as of December 31, 1962, it had, irrespective of its duty to render emergency service, a fixed and unquestioned obligation to perform overhauls pursuant to its extant contracts. The estimated cost to plaintiff of performing the overhauls for the entire year of July 1, 1962, to June 30, 1963, was $194,826.19. In accordance with the fact that approximately 50 percent of its overhauls were performed in each half year, plaintiff argues that half of the $194,826.19, or $97,413.09, was allocable to each 6-month period. Plaintiff claims that Schuessler v. Commissioner of Internal Revenue, 230 F.2d 722 (5th Cir. 1956), recently followed in Artnell Co. v. Commissioner of Internal Revenue, 400 F.2d 981 (7th Cir. 1968),

---

1. For the fiscal year July 1, 1962, to June 30, 1963, plaintiff earned income in the amount of $523,108 from all its service contracts. The actual expense incurred pursuant to contract performance for the 6-month period July 1, 1962, to December 31, 1962, was $341,821. The expense incurred during the succeeding 6 months was $341,575, making the total expense incurred for the year $683,396. The resultant total loss was therefore $160,288, approximately half of which, or $80,023, was sustained, according to plaintiff's method of accounting, in the first 6-month period. The stipulation of agreed facts does not reconcile the apparent inconsistency between some figures.

2. Plaintiff's income from all operations during the 6-month period July 1, 1962, to December 31, 1962, was $210,638, exclusive of the disallowed deferral of $199,560.43. The income from all operations for the second 6-month period was $641,937. This latter figure included the disallowed amount, and this total figure was used in the consolidated return filed by Signal Oil and Gas Company for the calendar year 1963. Consequently, the $199,560.43 was taxed in both 6-month periods.

and Beacon Publishing Co. v. Commissioner of Internal Revenue, 218 F.2d 697 (10th Cir. 1955), permit the deferral of income to offset a fixed future obligation of the sort here involved.

Defendant contends (1) that the regulations relied upon by plaintiff are inapplicable under the facts; and (2) that the general rule that income is to be included in the return for the period in which received, and is not to be deferred to meet future expenditures, requires the court to approve the Commissioner's disallowance of plaintiff's proposed deferral of income. Defendant, of course, relies for this latter proposition upon Schlude v. Commissioner of Internal Revenue, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963), American Auto Ass'n v. United States, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961), Automobile Club of Mich. v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), and the line of cases following those decisions.

█ We hold that plaintiff's construction of the applicable regulations is proper. We therefore do not reach the other issues raised by the parties. The pertinent regulations seem reasonably designed to effectuate the purposes of the statutes under which they were promulgated, and the validity of the regulations has not been questioned by the parties here. Under familiar principles, these regulations have the effect of law.[3] Accordingly, because the regulations control *in the circumstances unique to this case*, the Schlude line of cases is inapplicable, and we express no opinion regarding the effect those cases might have in other circumstances or their relation to the *Schuessler, Beacon,* and *Artnell* cases cited by plaintiff.

As the parties have stipulated, plaintiff's business was seasonal. During the cold winter months there was a great demand for fuel oil, while during the summer months plaintiff incurred losses. The greatest net profits were usually realized in January and February of each year. Thus, as the parties agree in paragraph 24 of the stipulation,

* * * It is not possible to determine the net income of plaintiff for any period of the year by multiplying the net income of the year by a fraction of which the numerator is the number of days of that period and the denominator is the total number of days in such year. It is not possible, therefore, to determine the net income for the period July 1, 1962 to December 31, 1962 by dividing in half the net income for the 12 month period July 1, 1962 to June 30, 1963. * * *

In the past, plaintiff's method of accounting has not caused any of the problems currently before us. This was simply because the fluctuations in income and expense due to the seasonal trade did not matter for tax purposes, so long as plaintiff was reporting its income annually. Its returns would correctly reflect the income includible in any given year, vis-a-vis any other year. The typical income deferral situation, dealt with in *Schlude* and similar cases, involves, however, the deferral of the recognition of income actually received in one year to the succeeding year or years. This is not the situation in the instant case.

Nonetheless, when a span of 6 months instead of a year is used as plaintiff's taxable period, difficulties similar to those considered in *Schlude* arise when the recognition of income received in one 6-month period is deferred until the next period. As the quoted stipulation recognizes, plaintiff's ratable allocation of its income from the service contracts

---

3. See, e.g., Henneberger v. United States, 403 F.2d 237, 242, 244, 185 Ct.Cl. 614, 623, 627 (1968); Cohen v. United States, 381 F.2d 383, 388, 180 Ct.Cl. 647, 658 (1967); Moran Bros., Inc. v. United States, 346 F.2d 590, 593, 171 Ct.Cl. 245, 249 (1965).

did not realistically reflect its income-expense structure for the July-to-December period for tax purposes, although the parties have agreed that the accounting method was commercially acceptable. Since plaintiff performed an approximately equal number of overhauls in each 6-month period of any year, there would appear to have been a basis for an allocation of part of the contract income equally between the periods. Emergency service, however, was apparently rendered primarily in the cold winter months during which the burners were in operation. Thus, plaintiff earned a substantially greater portion of its service contract income, and incurred more expense in relation thereto, during the winter months than during the other months of the year.

Yet, despite the seeming inadequacy for tax purposes of plaintiff's method of accounting for the 6-month short period, it is the very fact, in the circumstances of this case, that the taxable period involved was less than a year that brings special considerations into play. By reason of the sale of all the stock of plaintiff to Signal Oil and Gas Company, and the fact that Signal and its subsidiaries filed a consolidated return for calendar year 1963, it was necessary that plaintiff's income after January 1, 1963, be declared through the consolidated return.[4] It was likewise necessary for plaintiff to adopt the taxable year of its parent corporation to be eligible to file a consolidated return.[5] In order to comply with the regulations governing consolidated returns, plaintiff was also required to file a separate return for the first half of its fiscal year, that is, July 1, 1962, to December 31, 1962.[6]

The manner in which plaintiff's income *subsequent* to January 1, 1963, was to be computed was specified by regulation:

§ 1.1502–32A Method of computation of income for period of less than 12 months.

If a corporation, during the taxable year of the group, becomes a member or ceases to be a member of an affiliated group which makes or is required to make a consolidated return for such year, the income of such corporation to be included in the consolidated return shall be computed on the basis of its income as shown by its books if the accounts are so kept that the income for the period during which it is a member of the group can be clearly and accurately determined. If the accounts are not so kept, the income to be included in the consolidated return shall be computed on the basis of that proportion of its income (subject to the elimination of items exempt from the taxation and the addition of items not allowable as deductions) for the full period covered by its books which the number of days for which its income is included in the consolidated return bears to the number of days in the full period covered by its books; but, in the discretion of the Commissioner, there may be eliminated before the proration is made items of income or deduction clearly and accurately determined to be attributable to particular periods, and, after the proration is made, such eliminated items will be added to (if items of income) or deducted from (if deductible items) the income determined by proration for the period to which such items are applicable.

However, no regulation in existence in 1962 or 1963 specifically described the method to be employed to compute

---

4. Treas.Reg. § 1.1502–13A(d) (1955). As we have held in regard to consolidated-return regulations promulgated under the 1939 Code, such regulations have the force and effect of law. See Union Elec. Co. of Missouri v. United States, 305 F. 2d 850, 158 Ct.Cl. 479 (1962); cf. True

v. United States, 354 F.2d 323, 173 Ct. Cl. 706 (1965).

5. Treas.Reg. § 1.1502–14A(a) (1955).

6. Treas.Reg. § 1.1502–13A(g) (1955).

income for the period *preceding* the period of consolidation.

■ The only guidance plaintiff had, therefore, was section 1.1502–32A, as read in the light of section 446 of the Internal Revenue Code of 1954 and the regulations promulgated thereunder. Section 446 of the Code, as we have often recognized,[7] requires a taxpayer to secure the permission of the Commissioner before changing its method of accounting. But plaintiff, who had consistently filed its returns based on the accrual method of accounting, would not have been on notice that any change was required for reporting the 6-month short period. Section 1.446–1(a)(2) of the regulations seems clearly to indicate that a change was unnecessary particularly in light of the fact (stipulated by the parties) that plaintiff was using commercially acceptable accounting methods ordinarily used in the trade.

(2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

Read within this framework, section 1.1502–32A of the regulations would seem implicitly to oblige the plaintiff to follow its own books of account in preparing its separate return for the first 6 months of its fiscal year. Plaintiff had consistently filed its returns and kept its books in a manner allowable under the regulations and acceptable to the Commissioner. Section 1.1502–32A indicated that, for the period of the group's taxable year following consolidation, plaintiff's books were to be relied upon. As the plaintiff recognized and as the parties have stipulated, proration of plaintiff's income in accordance with the alternative provision of section 1.1502–32A would not accurately reflect plaintiff's income for tax purposes. Consequently, if proration were required, the parties implicitly recognize that the Commissioner, in his discretion, could have allocated items of income and expense to the appropriate 6-month period, as provided in the regulation. However, the alternative provision, concerning proration and the Commissioner's discretion to accept or modify the consequent reflection of income, does not come into play until and unless the taxpayer's books do not clearly reflect income.

The obvious implication to be drawn from the foregoing analysis of post-consolidation income treatment is that what was acceptable for the period following consolidation was also permissible for the period preceding it.

The regulation specified that the books of account were to be used in the preparation of the consolidated return if "the income for the period during which it is a member of the group can be clearly and accurately determined" therefrom. There is nothing in the regulation to indicate that plaintiff should have *changed* its method of accounting for the respective short periods to more clearly reflect income for tax purposes.

The period of consolidation was merely transitional. Whatever distortion of plaintiff's income structure, from a tax standpoint, might result by reason of the deferral of income would not be repeated. Particularly persuasive is the fact that the regulation apparently permitted just such a distortion of in-

---

7. *E.g., Wilson v. United States*, 376 F.2d 280, 179 Ct.Cl. 725 (1967); *Bullard Co. v. United States*, 364 F.2d 429, 176 Ct. Cl. 970 (1966); *Hackensack Water Co. v. United States*, 352 F.2d 807, 173 Ct. Cl. 606 (1965).

come for the 6-month period following consolidation. Plaintiff's situation was not that of such taxpayers as Schlude, whose system of annual accounting results in a distortion of income year after year.

Defendant, however, states in its brief that plaintiff did not become a member of the group "during the taxable year of the group," thereby apparently suggesting that the regulation could by implication govern only a separate return for that portion of the *group's* taxable year during which the new affiliate was still an independent corporation. Even if this interpretation is correct, it does not mean that the plaintiff was in error in relying on the regulation, in the absence of 'any better authority. Nor would that interpretation indicate to plaintiff that some other accounting method was to be used. Moreover, the phrase in question could reasonably have been read by plaintiff to mean only that the regulation affected all situations in which the taxable years of the group and the new member did not coincide.

In substance, then, plaintiff did everything possible to comply with the letter and spirit of the then existing tax law. Its interpretation of the implications of section 1.1502–32A, as read in the light of section 1.446–1(a) (2), was entirely reasonable, if not the most reasonable one possible. This is evidenced by the fact that a later-adopted regulation takes the same general position as did plaintiff.[8]

■ Plaintiff acted in complete accord with the regulations, and any dissatisfaction on the Government's part with plaintiff's treatment of income for the period in question is attributable to the lack of clarity in and omissions from the Government's own regulations. A taxpayer cannot be expected to intuit an unexpressed desire of the Internal Revenue Service that would seemingly contradict written revenue regulations which taxpayer is obliged to follow. The Commissioner is bound by its own regulations as much as is the taxpayer.[9] Accordingly, under the facts here present, the Commissioner was obligated to accept plaintiff's statement of income in its books of account, and was without discretion to refuse to allow a deferral of income which the regulations clearly indicated was proper.

For the above reasons, plaintiff's motion for summary judgment is granted. Defendant's cross-motion for summary judgment is denied. Judgment is entered for plaintiff in the amount of $103,-771.42, with interest * as provided by law on the sum of $100,268.77 from January 17, 1964, and with interest * as provided by law on the sum of $3502.65 from June 13, 1963.

---

8. "(4) *Allocation of income between separate and consolidated returns.* (i) If the taxable income of a member for a taxable year (determined without regard to a change of its year under paragraph (a) of this section) must be included in part in a consolidated return and in part in a separate return (or a consolidated return of another group), the taxable income to be reported in each such return shall be determined on the basis of its income shown on its permanent records (including work papers).

"(ii) If the portion of an item of income or deduction to be reported in each such return cannot be clearly determined from the permanent records, the portion of such item to be included in each such return shall be the amount of the item for the full taxable year (determined without regard to the change of year) multiplied by a fraction, the numerator of which is the number of days for which the member's income is to be included in such return and the denominator of which is the total number of days in such year." Treas.Reg. § 1.1502–76(b) (4) (1965).

9. Weyerhaeuser Co. v. United States, 184 Ct.Cl. 492, 395 F.2d 1005 (1968).

* Amended by Order dated January 27, 1969.