**BOISE CASCADE CORPORATION and Subsidiary Companies**

v.

**The UNITED STATES.**

**Nos. 321–69 and 81–71.**

United States Court of Claims.

Jan. 28, 1976.

Davis, J., concurred and filed an opinion.

Norton Kern, New York City, attorney of record for plaintiff; Lawrence C. Wilson, Reid & Priest, New York City, of counsel.

Donald H. Olson, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant; Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before LARAMORE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

**PER CURIAM:**

■ These are consolidated cases, in which plaintiffs seek the recovery of nearly $2,400,000 in income taxes plus interest thereon, paid for the years 1955 through 1961. They now come before the court on exceptions by the parties to the recommended decision filed by Trial Judge Lloyd Fletcher, on September 20, 1974, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. He held for the plaintiffs on all the significant issues. After briefing and oral argument, the court agrees with the trial judge in part, and disagrees in part. Our disagreement extends to all the portions of the opinion that deal with plaintiffs' gains from original issue discount. In *General Foods Corporation v. United States,* No. 70–73 (decided today), the stipulated facts as to this issue offer no legal distinction from the found facts at bar. The court has there held that the

gains attributable to original issue discount, on evidences of indebtedness issued after December 31, 1954, and before May 28, 1969, and held by plaintiff for periods of not more than six months, were ordinary income rather than short term capital gains. Accordingly, the discount was taxable currently as earned by these accrual basis taxpayers. In view of our full statement of reasons in *General Foods,* to which reference is made, it is unnecessary to repeat it here. The fact findings are left standing. Though not printed herewith, they have been furnished to the parties, and will suffice to document the identity of issues.

█ With respect to the claim of unlawful discrimination in favor of nonresident taxpayers, in that the Commissioner failed to tax as ordinary income original issue discount on their indebtedness held for six months or less, the court is of the opinion that the taxation of nonresident foreign taxpayers raises such different considerations that it cannot be compared, for equal protection purposes, to the taxation of domestic taxpayers.

We agree substantially with the portions of the recommended opinion that hold the Commissioner of Internal Revenue to have abused his discretion under IRC § 446(b), in determining that Ebasco's method of accounting failed to reflect income clearly for Federal Income Tax purposes and in requiring a change in such method as set forth below. The portions of the said trial judge's opinion that deal with this subject are set forth below and are adopted as our opinion with some modifications made by the court.*

The petitions with respect to original issue discount are dismissed, and judgment is entered for plaintiffs with respect to the accounting issue, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion.

Trial Judge Fletcher's opinion, as modified by the court, follows:

The plaintiffs are Boise Cascade Corporation and several of its subsidiary companies. The original petition was filed by Ebasco Industries Inc. and its subsidiary companies which had filed consolidated tax returns for the taxable years 1955 through 1958. Later, Ebasco Industries was merged with Boise Cascade in a non-taxable transaction, and the necessary steps were taken thereafter to consolidate the actions now before the court.

Ebasco Industries was engaged in holding various investments during the years 1955 through August 31, 1969, the date of its merger into Boise Cascade. These investments included marketable securities, short-term investments, and ownership interests in various operating subsidiaries which were (and continue to be) engaged primarily in rendering engineering, construction, architectural, and consulting services. Two of such subsidiaries were Ebasco Services, Inc. (Ebasco) and Chemical Construction Corporation (Chemical Construction). Ebasco Industries owned stock possessing at least 80 percent of the voting power of all classes of stock of those subsidiary corporations.

The plaintiffs' annual shareholder reports included a certification by independent accountants that the financial statements were prepared in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

In its business, Ebasco Services enters into contracts to perform engineering and similar services. Under the various terms of these contracts, Ebasco is entitled to bill fixed sums either in monthly, quarterly, or other periodic installments, plus such additional amounts as may be provided for in a particular contract. Depending on the terms of the different contracts, payments may in some cases be due prior to the annual period in which such services are to be performed, and in some cases subsequent thereto.

---

* The concurring opinion of Judge Davis follows the opinion of the trial judge which has been adopted as modified by the court.

For a number of years prior to 1959 and continuing to the time of trial, Ebasco included in its income for both book and tax purposes amounts attributable to services which it performed during the taxable year, a procedure accepted by the Internal Revenue Service on prior audits. Ebasco determined the amounts so earned by dividing the estimated number of service hours or days required to complete the particular contract into the contract price. The resulting quotient represents an hourly or daily rate which is then multiplied by the number of hours or days actually worked on the contract during the taxable year. As the contract is performed, the rate is adjusted to reflect revised estimates of the work required to complete the contract.

Where Ebasco billed for services prior to the tax year in which they were performed, it credited such amounts to a balance sheet account called "Unearned Income". Where the services were performed in a subsequent period, the "Unearned Income" account was debited, and such amounts were included in an income account called "Service Revenues." The amount recorded in the latter account was included in income for both book and tax purposes. In determining the amount which was to be included in the "Unearned Income" account, the costs of obtaining the contract were not taken into account;[1] and, with the exception of prepaid insurance and similar items, all such amounts were expensed in the tax year during which they were incurred. The amounts in the "Unearned Income" account were treated as liabilities and were excluded from gross income for each tax year consistently in Ebasco's books, records, and shareholder reports, as well as in its tax returns. All of the amounts included in the account during one tax year were earned through the performance of services during the following year and were included in income for such following tax year. When the amounts credited to the "Unearned Income" account were collected, Ebasco had an unrestricted right to the use of such funds.

During the three tax years in issue, an average of over 94 percent of the amounts included in the "Unearned Income" account was received by Ebasco under contracts which obligated it to perform engineering services in connection with the design and construction of electric generating plants. These contracts either required that services be performed by a specified date or required that Ebasco should perform those services "with all reasonable dispatch and diligence," as "expeditiously as possible," or some comparable requirement. The small remaining amounts in the account were received either under contracts which required Ebasco to perform specific services in connection with a specific project of a client, or required Ebasco to provide consultation and advice on an annual basis for an annual fee.

In addition to its "Unearned" account, Ebasco maintained an "Unbilled Charges" account computed in the same manner as the "Unearned Income" account. The balance in such account represented amounts earned through the rendering of services, or on partially completed contracts, or earned prior to contracting under all of which payment was not then due by the terms of a contract or was not billable and due prior to execution of a future contract. Stated another way, the amounts included in this account were those which Ebasco was not entitled to bill or receive until a year subsequent to the year in which the services were actually rendered. Such amounts were recorded in "Service Revenues" and included in income for tax as well as book purposes in the taxable year in which the services were rendered. Likewise, the costs attributable to the rendering of services which produced the year-end balance in the "Unbilled Charges" account were deducted from

---

1. These amounts included the cost of preparing bids, proposals, and estimates, overhead, advertising, and selling expenses.

gross income in the year such services were rendered. In 1959, 1960, and 1961 there were approximately $405,000, ($56,-000), and $179,000 of such net amounts, respectively, carried in the "Unbilled Charges" account.

Plaintiffs' consolidated income tax returns for 1959 through 1961 were audited by the Government, and the amounts in the "Unearned Income" account were included in taxable income for Federal tax purposes. These adjustments were made pursuant to section 446(b) of the 1954 Code under which the Commissioner determined that plaintiffs' deferral method of accounting did not clearly reflect income. During the same examination for the same tax years, no adjustments were made to the "Unbilled Charges" or the "Service Revenues" accounts.

At trial Ebasco presented expert testimony related solely to the accounting practices described above. The sole witness was a qualified certified public accountant and a partner in a major accounting firm. Based on his broad experience with comparable service companies and his personal familiarity with the accounting practices of Ebasco, he expressed his expert opinion with respect to the accounts in issue and the changes made by the Commissioner.

He testified that the method of accounting used by Ebasco which employs both an "Unearned Income" account and an "Unbilled Charges" account and is based on accruing amounts as income at the time the related services are performed is in accordance with recognized and generally accepted accounting principles and clearly reflects Ebasco's income. He indicated that this method properly matched revenues with costs of producing such revenues and is particularly appropriate in this case because almost all of Ebasco's income is derived from the performance of services by its own personnel. He further testified that this method of accounting was widely used by companies engaged in rendering engineering and similar services, and that such method clearly reflected the income of Ebasco.

With respect to costs incurred in obtaining contracts, such as bid preparation, overhead, advertising, and other selling expenses, the witness considered them to be properly deducted in the year incurred as continuing costs of doing and developing business.[2] He explained that these costs should not properly be amortizable over the life of any particular contract since they were costs connected with new business development and were unrelated to performance of the contract.

The accounting method proposed by the Commissioner requires Ebasco to accrue as income the amounts included in the "Unearned Income" account and also requires the accrual, consistent with plaintiffs' accounting method, of amounts in the "Unbilled Charges" account. In the opinion of plaintiffs' expert, this method of accounting was not in accordance with generally accepted accounting principles and did not clearly reflect Ebasco's income. To him, the Commissioner's method was erroneous in that it required the inclusion in income of amounts billed but not yet earned on contracts in one accounting period without at the same time acknowledging the obligations and costs to be incurred by Ebasco in the future performance of such contractual commitments. He termed such method as "hybrid" in that while it recognized the accrual method with respect to unbilled charges which were earned but not yet billable, it had the effect of imposing a cash basis method as to the billed but unearned charges in the "Unearned Income" account.

Finally, the witness testified that if Ebasco were to use a method of accounting under which amounts in the "Unearned Income" account would be accrued as income and amounts in the

2. The witness distinguished such costs from commissions which in some instances may properly be amortized where they relate directly to the contract involved and thus reduce the amount realizable under such contract.

"Unbilled Charges" account would *not* be accrued as income, such method would more clearly reflect the income of Ebasco than the method of accounting proposed by the Commissioner. He stated that, while such method was not technically in accordance with generally accepted accounting principles, it was a more logical and consistent approach to use in determining the income of Ebasco than the Commissioner's method.

The remaining issues involved in this case thus concern the accounting method employed by one of the plaintiffs, Ebasco Services (referred to below as "Ebasco"). Plaintiffs maintain that the method of deferral accounting employed by Ebasco (as described above) clearly reflects income and, therefore, is entirely proper for Federal income tax purposes. Alternatively, they contend that if Ebasco is required to accrue as income amounts in its deferred "Unearned Income" account, then in order clearly to reflect income, it should not accrue as income the amounts included in its "Unbilled Charges" account (also described above). With regard to the first of these contentions, the Government responds that the method of deferral accounting employed by Ebasco did not in fact clearly reflect income for tax purposes. As to the alternative contention, the Government agrees with Ebasco's original accounting treatment and insists that amounts in the "Unbilled Charges" account where properly accrued. The Government adds that acceptance of Ebasco's alternative contention would necessarily mean a change of accounting method for which plaintiffs admittedly have failed to obtain the consent of the Secretary or his delegate as required by section 446(e) of the 1954 Code.

■ These issues present but another facet in the continuing controversy over the proper timing for Federal income tax purposes of various income and expense items incurred by an accrual basis taxpayer. Based on expert accounting testimony presented by Ebasco at trial, it can hardly be disputed that Ebasco's

system for deferral of unearned income is in full accord with generally accepted accounting principles as that phrase is used in financial or commercial accounting. But such a showing alone is not determinative for income tax purposes. The taxpayer must also show that its method clearly reflects income for the purposes of the Internal Revenue Code. Thus, while generally accepted methods of accounting are of probative value and are treated with respect by Treas.Reg. § 1.446–1(a)(2), they are not necessarily synonymous with the proper tax accounting to be afforded an accrual item in a given situation. *See Field Enterprises Inc. v. United States,* 348 F.2d 485, 489, 172 Ct.Cl. 77, 84 (1965), *cert. denied,* 382 U.S. 1009, 86 S.Ct. 614, 15 L.Ed.2d 525 (1966); *Cincinnati, New Orleans and Texas Pacific Ry. v. United States,* 424 F.2d 563, 570, 191 Ct.Cl. 572, 583 (1970), and *Simplified Tax Records, Inc.,* 41 T.C. 75, 81 (1963).

This variance is especially noticeable in cases where the taxpayer's accounting method results in the deferment of income. The taxpayer in such a situation is generally relying on well-known accounting principles which essentially focus on a conservative matching of income and expenses to the end that an item of income will be related to its correlative expenditure. Tax accounting, on the other hand, starts from the premise of a need for certainty in the collection of revenues and focuses on the concept of ability to pay. Thus, under this theory, where an item of income has been received even though as yet unearned, it should be subject to taxation because the taxpayer has in hand (or otherwise available) the funds necessary to pay the tax due. (*See,* Silk, *Advance Payments-Prepaid Income: Recent Developments: An Old Problem Put to Rest,* 30 N.Y.U.Inst.Fed.Tax., 1651, 1652–1653 (1972)).

Putting such theoretical considerations aside for the moment, it may be helpful briefly to resummarize Ebasco's long-consistent method of accounting under which receipts are accrued and reported as income only at the time the engineer-

ing and similar services which generate such receipts are rendered. In many cases, Ebasco's right to bill or receive payment arose prior to the annual accounting period in which the related services were to be performed. In other cases, the right to bill or receive payment arose subsequent to the annual accounting period in which the services were performed.

When under the terms of a contract Ebasco billed a client prior to the accounting period in which the related services were rendered, Ebasco debited the amount billed to accounts receivable and credited it to a balance sheet liability account called "Unearned Income." Subsequently, when the services were rendered, the income earned was debited to the "Unearned Income" account and credited to the income account "Service Revenues." The amounts recorded in the "Services Revenues" account were reported as income for both book and tax purposes. All of the amounts which were included in the "Unearned Income" account at the end of a taxable year were earned through the performance of services in the next succeeding year and were accrued and reported as income in such next succeeding taxable year for both book and tax purposes.

When services were performed in an annual accounting period and Ebasco was not entitled to bill a client for such services until a subsequent annual accounting period under the terms of a contract, Ebasco debited the amount attributable to such services to the balance sheet account "Unbilled Charges" and credited a like amount to "Service Revenues." The amount recorded in the "Service Revenues" account was reported as income for both book and tax purposes. Ebasco's cost of rendering the services which produced the amounts recorded in the "Unbilled Charges"

account were deducted from gross income for that year for both book and tax purposes.

Thus, it can readily be seen that, under Ebasco's system, all amounts reported as income were determined with reference to the related services performed within the annual accounting period. The record clearly establishes that such system is a generally accepted accounting method for a business such as Ebasco's. Does it clearly reflect income as required by section 446 of the Code?[3]

Defendant stoutly responds to that question in the negative. It relies heavily on the decisions of the Supreme Court in *American Automobile Ass'n v. United States*, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961) and *Schlude v. Commissioner of Internal Revenue*, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963), which cases defendant contends have firmly established the rule that, in the absence of a specific statutory exception, a taxpayer has no right to defer recognition of income received or accrued under a contract for the performance of services.

Counsel for Ebasco respond with equal vigor that Ebasco's accounting system does, in fact, clearly reflect income. To them, the Supreme Court in the above-cited decisions only held that the Commissioner of Internal Revenue did not abuse his discretion under section 446 by rejecting what the Court referred to as a "purely artificial" accounting method. Ebasco's counsel are astonished that defendant could in this case interpret *American Automobile* and *Schlude* as preventing any income deferral when, as recently as 1971, the Commissioner, in Rev.Proc. 71–21, 1971–2 C.B. 549 has held that taxpayers may defer the inclusion in income of payments received in one taxable year for services to be performed in the next succeeding year.

---

**3.** In pertinent part, section 446 reads:

"SEC. 446. *General rule for methods of accounting.*

"(a) *General rule.*—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

"(b) *Exceptions.*—If no method of accounting has been regularly used by the taxpayer *or if the method used does not clearly reflect income,* the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income." [Emphasis supplied.]

■ Although one can hardly speak with complete confidence in this troublesome and confusing area of tax law as affected by modern accounting methods, I think it fair to conclude that, on balance, Ebasco's position in this litigation is the reasonable one of the conflicting viewpoints.

The starting point, of course, must involve a close look at the trilogy of Supreme Court decisions dealing with the problem of income deferral. Those cases are *Automobile Club of Michigan v. Commissioner of Internal Revenue*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *American Automobile Ass'n v. United States, supra*, and *Schlude v. Commissioner, supra*.

In *Michigan*, the Court sustained the action of the Commissioner of Internal Revenue in rejecting the taxpayer's method of deferral accounting pursuant to the authority of section 41 of the 1939 Code, the predecessor of 1954 Code section 446(b), *supra*. The taxpayer was engaged in performing various services to the automotive industry including the rendition of services to members of the club but only upon their specific request. Under its method of accounting, the club deferred taking into income the full amount of annual membership dues which the club required to be paid in advance, irrespective of whether the dues-paying member might call upon the club for any services during the 12-month period. Upon collection, these prepaid amounts were deposited in the club's regular bank account and used for general corporate purposes. In its books, the club entered these prepaid amounts into a liability account titled "Unearned Membership Dues," and thereafter for each of the 12 months of membership, one-twelfth of the amounts so paid was credited to an account called "Membership Income." In sustaining the Commissioner's rejection of this accounting method as not clearly reflecting income, the Court held:

The pro rata allocation of the membership dues in monthly amounts is *purely artificial and bears no relation to the services which petitioner may in fact be called upon to render for the member.* Section 41 vests the Commissioner with discretion to determine whether the petitioner's method of accounting clearly reflects income. We cannot say, in the circumstances here, that the discretionary action of the Commissioner, sustained by both the Tax Court and the Court of Appeals, exceeded permissible limits * * * 353 U.S. 189, 77 S.Ct. 712. [Emphasis supplied.]

Four years later, the issue returned to the Court in the *American Automobile* case. While the facts were essentially similar to those in *Michigan*, it was contended in *American Automobile* that the earlier case did not control because the Court had before it at last a full record containing expert accounting testimony that the system used was in accord with generally accepted accounting principles, that proof of membership service cost was detailed, and that the correlation between such cost and the period of time over which the dues were credited as income was shown and justified by proof of experience.

The Court, however, was unimpressed. Unable to perceive any significant difference between the methods of operation and accounting employed by the two automobile clubs, the Court held that, just as in *Michigan*, the American Automobile Association's system of accounting was "purely artificial" because "substantially all services are performed only upon a member's demand and the taxpayer's performance was not related to fixed dates after the tax year." 367 U.S. 691, 81 S.Ct. 1729. The Court explained at 692, 81 S.Ct. at 1729:

It may be true that to the accountant the actual incidence of cost in serving an individual member in exchange for his individual dues is inconsequential, or, from the viewpoint of commercial accounting, unessential to determination and disclosure of the overall financial condition of the Association. That "irregularity," however, is highly relevant to the clarity of an account-

ing system which defers receipt, as earned income, of dues to a taxable period *in which no, some, or all of the services paid for by those dues may or may not be rendered.* The Code exacts its revenue from the individual member's dues which, no one disputes, constitute income. When their receipt as earned income is recognized ratably over two calendar years, *without regard to correspondingly fixed individual expense or performance justification,* but consistently with overall experience, their accounting doubtless presents a rather accurate image of the total financial structure, but fails to respect the criteria of annual tax accounting and may be rejected by the Commissioner. [Emphasis supplied.] [4]

The third of this trilogy of cases is *Schlude v. Commissioner, supra,* where the Court again rejected an attempt by an accrual basis taxpayer to defer prepaid amounts for future services. The taxpayers there operated a dance studio and offered dancing lessons under contracts which required the students to pay their tuition in advance with *no right to refund, i.e.,* the studio was entitled to receive the advance payments under the contracts irrespective of whether the studio was ever called upon to render any teaching services. [5] At the end of each fiscal period, the total number of actually taught hours were multiplied by the applicable hourly rate. The resulting sum was then deducted from the deferred income account and reported as earned income on taxpayers' financial statements and income tax returns.

The Court held that the case was "squarely controlled by *American Automobile Association,*" (372 U.S. 134, 83 S.Ct. 604) and sustained the Commissioner's rejection of Schlude's accounting method. Said the Court at 135–136, 83 S.Ct. at 605:

> The *American Automobile Association* case rested upon an additional

ground which is also controlling here. Relying upon *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746, the Court rejected the taxpayer's system as *artificial since the advance payments related to services which were to be performed only upon customers' demands without relation to fixed dates in the future. The system employed here suffers from that very same vice,* for the studio sought to defer its cash receipts on the basis of contracts which did not provide for lessons on fixed dates after the taxable year, but left such dates to be arranged from time to time by the instructor and his student. Under the contracts, the student could arrange for some or all of the additional lessons or could simply allow their rights under the contracts to lapse. But even though the student did not demand the remaining lessons, the contracts permitted the studio to insist upon payment in accordance with the obligations undertaken and to retain whatever prepayments were made without restriction as to use and without obligation of refund. At the end of each period, while the number of lessons taught had been meticulously reflected, the studio was uncertain whether none, some or all of the remaining lessons would be rendered. *Clearly, services were rendered solely on demand in the fashion of the American Automobile Association and Automobile Club of Michigan cases.* [Emphasis supplied.]

It seems clear to me that, despite defendant's vigorous contention to the contrary, this trilogy of Supreme Court decisions cannot be said to have established an unvarying rule of law that, absent a specific statutory exception, a taxpayer may never defer recognition of income received or accrued under a contract for the performance of future services, no

---

**4.** Discussion of the Court's treatment of "other considerations" bearing upon its decision appears below.

**5.** No dates for dancing lessons were fixed but simply left to a mutually agreeable arrange-

ment between student and teacher. Significant amounts of income flowed from cancellations resulting in no performance of services.

matter whether such deferral clearly reflects income.

Defendant persuasively argues, however, that its interpretation of the cases is justified by the Court's additional ground for decision in both *American Automobile* and *Schlude*. In both cases, it is true, the Court's majority and minority opinions gave close consideration to the legislative history of sections 452 and 462 of the 1954 Code.[6] These sections contained the first explicit legislative sanctions of deferral of income (§ 452) and deduction of future estimated expenses (§ 462). In the next year, however, both sections were retroactively repealed. Ch. 143, 69 Stat. 134. To the majority in *American Automobile*, this repealer action constituted "clearly a mandate from the Congress that petitioner's system was not acceptable for tax purposes." 367 U.S. 695, 81 S.Ct. 1731. The dissent, of course, viewed the legislative history in different perspective.[7]

To me, the dilemma and its likely solution, have been gracefully and accurately stated by the able and comprehensive opinion of the Fifth Circuit Court of Appeals in *Mooney Aircraft, Inc. v. United States*, 420 F.2d 400, 408–409 (5th Cir., 1969) where the court observed:

> This alternative ground, based on legislative intent, would seem to dispose of the entire question: *all* deferrals and accruals are bad unless specifically authorized by Congress. But the Court was careful to discuss the legislative history as dictum and restricted its holding to a finding that the Commissioner did not abuse his discretion in rejecting the *AAA's* accounting system. It specifically refrained from

overruling *Beacon* [*Beacon Publishing Co. v. Commissioner of Internal Revenue*, 218 F.2d 697 (10th Cir. 1955) (deferral of prepaid subscriptions)] and *Schuessler* [*Schuessler v. Commissioner of Internal Revenue*, 230 F.2d 722 (5th Cir. 1956) (accrual of expenses of 5-year service period)], distinguishing them on the ground that future performance was certain. *AAA, supra*, 367 U.S. at 692, n. 4, 81 S.Ct. 1727. It seems, then, that the Court is for the present taking a middle ground pending Congressional reform and clarification in this extremely confused area of the law: While the repeal of §§ 452 and 462 does not absolutely preclude deferrals and accruals, it indicates that the Commissioner should have very broad discretion to disallow such accounting techniques when there is any reasonable basis for his action.

The *Mooney Aircraft* approach was foreshadowed by the Seventh Circuit's decision in *Artnell Company v. Commissioner of Internal Revenue*, 400 F.2d 981 (7th Cir., 1968). There, Chicago White Sox, Inc. had received and accrued in a deferred unearned income account amounts attributable to advance ticket sales and revenues for other services related to baseball games to be played thereafter during the 1962 season. Prior to such performance, however, Artnell acquired Chicago White Sox, Inc., liquidated it, and continued operation of the team. In the final short-year return filed as transferee by Artnell in behalf of White Sox, Inc., Artnell excluded the deferred unearned income previously received by White Sox. The Commissioner required such amounts to be accrued as income to White Sox on receipt, and the Tax Court sustained him. In reversing

---

**6.** 68A Stat. 152 and 168.

**7.** For example, in his *Schlude* dissent, Mr. Justice Stewart observed at 372 U.S. 139–140, 83 S.Ct. 607:

"For the reasons I have elsewhere stated at some length, to rely on the repeal of §§ 452 and 462 as indicating congressional disapproval of accrual accounting principles is conspicuously to disregard clear evidence of legislative intent. The Secretary of the Treasury, who proposed the repeal of these sections, made

explicitly clear that no inference of disapproval of accrual accounting principles was to be drawn from the repeal of the sections. So did the Senate Report. The repeal of these sections was occasioned solely by the fear of temporary revenue losses which would result from the taking of "double deductions" during the year of transition by taxpayers who had not previously maintained their books on an accrual basis." [Footnotes omitted.]

and remanding, the Seventh Circuit analyzed the Supreme Court's trilogy, *supra*, and said at 400 F.2d 984–985:

Has the Supreme Court left an opening for a decision that under the facts of a particular case, the extent and time of future performance are so certain, and related items properly accounted for with such clarity, that a system of accounting involving deferral of prepaid income is found clearly to reflect income, and the commissioner's rejection deemed an abuse of discretion? Or has it decided that the commissioner has complete and unreviewable discretion to reject deferral of prepaid income where Congress has made no provision? The tax court apparently adopted the latter view, for it concluded "that the Supreme Court would reach the same decision regardless of the method used by the taxpayer for deferring prepaid income."

It is our best judgment that, although the policy of deferring, where possible, to congressional procedures in the tax field will cause the Supreme Court to accord the widest possible latitude to the commissioner's discretion, there must be situations where the deferral technique will so clearly reflect income that the Court will find an abuse of discretion if the commissioner rejects it.

Prior to 1955 the commissioner permitted accrual basis publishers to defer unearned income from magazine subscriptions if they had consistently done so in the past. He refused to allow others to adopt the method. In 1955 his refusal was held, by the tenth circuit, in *Beacon*, to be an abuse of discretion. In *Automobile Club of Michigan*, the Supreme Court distinguished *Beacon*, on its facts, because "performance of the subscription, in most instances, was, in part, necessarily deferred until the publication dates after the tax year." The Court, however, expressed no opinion upon the correctness of *Beacon*. In 1958, Congress dealt specifically with the *Beacon*, problem. It is at least arguable that the deferral as income of prepaid admissions to events which will take place on a fixed schedule in a different taxable year is so similar to deferral of prepaid subscriptions that it would be an abuse of discretion to reject similar accounting treatment.

In any event the prepaid admission situation approaches much closer to certainty than the situations considered in *Automobile Club of Michigan, American Automobile Association*, or *Schlude*. [Footnotes omitted.]

Judicial reaction to *Artnell* has been mixed. Compare, for example, *Hagen Advertising Displays, Inc. v. Commissioner of Internal Revenue*, 407 F.2d 1105 (6th Cir., 1969) and *Angelus Funeral Home v. Commissioner of Internal Revenue*, 407 F.2d 210 (9th Cir., 1969), *cert. denied*, 396 U.S. 824, 90 S.Ct. 65, 24 L.Ed.2d 74; with *New Eng. Tank Indus. of N. H., Inc. v. Commissioner of Internal Revenue*, 413 F.2d 1038 (1st Cir., 1969). *See, also, Petroleum Heat and Power Co. v. United States*, 405 F.2d 1300, 1302–1304, 186 Ct.Cl. 486, 492–495 (1969). Defendant's reaction, of course, is simply that "*Artnell* was wrongly decided." Df's Br. p. 33.

Out of this mélange, one must choose a path. To use one of Justice Holmes' favorite expressions, I "can't help" but conclude that what Ebasco is pleased to call its "balanced and symmetrical" method of accounting does in fact clearly reflect its income. It achieves the desideratum of accurately matching costs and revenues by reason of the fact that the costs of earning such revenues are incurred at the time the services are performed. *See, Mooney Aircraft, supra*, 420 F.2d at 403. Entirely unlike the factual situations before the Supreme Court in the automobile club and dance studio cases, Ebasco's contractual obligations were fixed and definite. In no sense was Ebasco's performance of services de-

pendent solely upon the demand or request of its clientele.[8]

Based upon the foregoing considerations, it is necessary to conclude that Ebasco's method of accounting under which income is accrued as the related services are performed clearly reflects its income, and, accordingly, the Commissioner is not authorized by § 446(b) to impose another method of accounting. That this is true becomes particularly obvious when it is realized that the accounting method imposed upon Ebasco by the Commissioner is a classic example of a hybrid system combining elements of the accrual system with a cash system, a mixture generally viewed with disfavor. *See, Hackensack Water Co. v. United States,* 173 Ct.Cl. 606, 611, 352 F.2d 807, 809 (1965). Thus, where Ebasco's billing precedes the rendition of its contracted-for services, the Commissioner proposes to tax as income amounts billed even though such amounts have not then been earned by performance. On the other hand, where the performance of services precedes billing, the Commissioner would tax amounts as income at the time the services are rendered even though, under such contracts, Ebasco has no present right to bill, or receive payment of such amounts. The inconsistency within the Commissioner's method is strident.

His method would appear to the ordinary mind to distort income instead of clearly reflecting it. Judging both by what he has rejected and what he would impose he has abused his discretion within the meaning of the authority cited,

*Mooney Aircraft* and *Artnell.* Ebasco has demonstrated not only that its method of accounting is in accordance with generally accepted accounting principles but, in addition, clearly reflects its income, treating these issues to be discrete, as we must. Therefore, the amounts accrued in Ebasco's "Unearned Income" account are not taxable until the year in which Ebasco performs the services which earn that income.[9]

DAVIS, Judge (concurring):

On the issue of original issue discount, I refer to my concurring opinion in *General Foods Corp. v. United States,* No. 70–73. On the so-called "accounting" issue, I join the court in adopting (with some modifications) Trial Judge Fletcher's opinion.

### CONCLUSION OF LAW

Upon the findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on the accounting issue and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion. Judgment is entered for defendant and the petitions are dismissed with respect to original issue discount.

---

8. By way of illustrating the point, the overwhelming majority of the amounts carried in the "Unearned Income" account were paid to Ebasco pursuant to contracts for the performance of engineering services in the design and construction of electric generating plants. The construction of such a plant is, of course, a vast and complicated project involving many contractors and suppliers whose activities must be closely coordinated under rigid schedules. Therefore, as pointed out by Ebasco, there was never any question but that Ebasco had to perform its engineering services all of which were absolutely necessary to completion of the project. Many contracts contained fixed and specific dates for Ebasco's performance; others simply required Ebasco to pro-

ceed as "expeditiously as possible" or similar language. Thus, unlike the taxpayers in the Supreme Court decisions, Ebasco had a fixed obligation to perform its services without the uncertainty as to performance so prominent in those cases.

9. This conclusion makes it unnecessary to pass on Ebasco's alternative contention, namely, that if required to accrue as income the amounts entered in its "Unearned Income" account, then in order clearly to reflect income Ebasco should not be required to accrue as income the amounts entered in its "Unbilled Charges" account.