106 T.C. No. 5


UNITED STATES TAX COURT


SIGNET BANKING CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7887-92.       Filed February 29, 1996.


<u>Christopher Kliefoth</u> and <u>Ralph I. Petersberger</u>, for
petitioner.

<u>Phillip A. Pillar</u> and <u>Scott D. Anderson</u>, for respondent.


        P is in the banking business.  P issued credit
cards.  P charged its credit card holders an annual
membership fee.  The cardholder agreement provided that
the fee was paid in consideration of the issuance of a
card and establishment of a credit limit.  The
agreement stated that P could close a cardholder's
account at any time and that the annual membership fee
was nonrefundable.  P is an accrual method taxpayer.

Held, it was not an abuse of discretion for R to conclude that P must report annual membership fees in income in the year of receipt.

Held, further, Rev. Proc. 71-21, 1971-2 C.B. 549, does not permit P to report income from annual membership fees later than the year of receipt.

COLVIN, Judge: Respondent determined deficiencies in petitioner's Federal income tax of $233,464 for 1982, $689,257 for 1983, $1,177,475 for 1984, and $1,529,931 for 1985.

The sole issue for decision is whether annual membership fees petitioner received from its credit card customers are includable in income in the year in which petitioner received them, or whether petitioner may defer the income over a 12-month period under Rev. Proc. 71-21, 1971-2 C.B. 549.

Under the cardholder agreements in effect during the years in issue, the annual membership fee was paid in consideration of the issuance of a card and the establishment of a credit limit, petitioner could close any account at any time, and the fee was nonrefundable. Petitioner's right to receive the annual membership fees was not contingent on petitioner's performance of any service after the year of receipt. We hold that it was not an abuse of discretion for respondent to conclude that petitioner must include the fees in income in the year of receipt.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

1. Petitioner

Petitioner is a Virginia bank holding company that has its principal place of business in Richmond, Virginia. Petitioner is the parent of a consolidated group of corporations and the successor to the Bank of Virginia Co. (BOVACO). BOVACO was the parent of an affiliated group of corporations that filed consolidated Federal income tax returns from 1982 to 1985. BOVACO changed its name to Signet in 1986. Petitioner is in the banking business. Petitioner is an accrual method taxpayer.

2. The MasterCard Credit Cards

In 1953, petitioner started the BOVA (Bank of Virginia) Charge Plan. In 1967, petitioner was a founding member of the Interbank Card Association, which later became MasterCard International. Before, during, and after the years at issue, petitioner issued MasterCards and a small number of Visa credit cards.[1]

---

[1] The parties agreed to refer to petitioner's cardholders as MasterCard cardholders even though respondent's determination also applies to annual membership fees charged to Visa cardholders.

Petitioner's cardholders may use their MasterCards to charge the cost of goods and services purchased from participating merchants.  The merchants submit MasterCard sales receipts to their merchant bank.  The merchant bank processes merchants' credit card transactions.  The merchant bank pays the merchants the amount of the charges less a merchant discount.  The merchant discount is a set percentage, e.g., 2-1/4 percent, of total charges.  The merchant bank transfers the sales draft through interchange to an issuing bank such as petitioner.  The issuing bank pays the merchant bank the amount of the sales draft less an interchange fee (for example, 1-1/2 percent of the sales draft).  The interchange fee is paid by the merchant bank to the issuing bank.  The issuing bank bills the cardholder for the full amount of the sales draft.

Before 1981, petitioner earned interchange fees from merchant banks.  Petitioner earned merchant discounts when it was both a merchant bank and an issuing bank.

Before 1981, petitioner had two primary sources of income from MasterCard cardholders:  (a) About 90 percent was from finance charges paid by cardholders who paid less than their full balance, and (b) about 10 percent was from interchange fees described above.  Petitioner also received from cardholders over limit fees (not defined in the record), cash advance fees until May 1983, and other charges, including late payments and credit

life insurance.  Petitioner also received a fee of 2 percent of the transaction amount for automated teller machine (ATM) and check access until May 1983.

3.  Annual Membership Fees

a.  Petitioner's Decision to Charge an Annual Membership Fee

In 1980, petitioner's MasterCard business lost money because the cost of funds used by petitioner was high compared to the finance charge it could apply to MasterCard cardholders.

Petitioner had three types of cardholders.  About 70 percent were in the "revolver" group (i.e., those who paid less than the balance due each month and incurred finance charges on the outstanding balance).  About 30 percent were "convenience users" (i.e., those who used their cards, paid their balance in full, and thus did not owe finance charges).  A small number were "inactive" (i.e., those who may have used their MasterCards as identification but did not use them to pay for goods or services).  Convenience users generated interchange fees but not finance charges.  As a group they were minimally profitable. The inactive group cost petitioner money but generated no income. Petitioner decided to impose an annual membership fee to recover some of the cost of delivering services to each group.

Petitioner began to charge its MasterCard cardholders an annual membership fee in April 1981.  Thereafter, petitioner's credit card division derived income from commissions deducted

from amounts paid to merchants (merchant discount), interchange fees, annual membership fees, finance charges paid by cardholders, cash advance fees (until May 1983), over limit fees, and other charges (such as late payment and credit life fees).

Other major banks were charging annual membership fees for credit cards when petitioner decided to charge an annual fee. Petitioner was one of the first Virginia banks to do so.

b.   Annual Membership Fees Charged by Petitioner

To become or remain a MasterCard cardholder after April 1, 1981, petitioner required payment of an annual membership fee of $15 for a regular MasterCard or $36 for a Special Edition Gold MasterCard or a commercial account.  On April 1, 1981, petitioner began to charge its regular MasterCard cardholders an annual membership fee of $15 regardless of the cardholder's credit line, usage, balance (if any) carried from month-to-month, or credit standing.  Petitioner first billed cardholders for the annual membership fee in July 1981.  In 1986, petitioner raised the $15 annual membership fee to $18 per year.  From 1983 to 1985, petitioner also offered affinity group (i.e., alumni of a particular university) MasterCards for $18 and $20.

c.   Implementation of the Annual Membership Fee

Petitioner sent its cardholders a disclosure statement as required by Regulation Z, 12 C.F.R. sec. 226.9(b) (1981), stating the change in contract terms and a letter describing the services

provided to cardholders.  William F. Binns, petitioner's vice president in charge of credit card services, answered telephone and written inquiries objecting to the new fee.  He told cardholders that the card was a good value for $1.25 a month.

Petitioner projected that, as a result of imposing the annual membership fee, it would lose 25 percent of its MasterCard accounts, including most in the inactive group and many of the convenience users.  Although many closed their accounts, the number who did so was less than petitioner had projected.

From 1983 to 1985, petitioner imposed the annual membership fee at the start of each cardholder's membership year. Petitioner billed the fee on the first statement for that year.

From 1983 to 1985, petitioner typically charged cardholders who incurred interest charges on their balances an 18-percent annual percentage rate.  Petitioner charged its Gold MasterCard customers a lower rate and charged some of its non-Virginia customers up to 21 percent.  Petitioner considered its Gold MasterCard customers to be lower risks even though they typically carried higher monthly balances.

From 1983 to 1985, petitioner occasionally waived the first year's membership fee if the customer was a member of an affinity group, waived the annual fee for the year in response to some customer complaints, and waived the annual fee for some active customers who threatened to leave.  Otherwise, petitioner

canceled the MasterCard accounts of cardholders who did not pay the annual membership fee.

Petitioner had the following number of MasterCard accounts at yearend:

| Year | Number of MasterCard Accounts |
|------|-------------------------------|
| 1983 | 682,143 |
| 1984 | 759,415 |
| 1985 | 853,498 |

4. MasterCard Cardholder Agreements

As required by Regulation Z (12 C.F.R. sec. 226.9(a)), petitioner gave a copy of a charge plan customer agreement and truth in lending disclosure (the cardholder agreement) to everyone who opened an account. Thereafter, petitioner did not give a copy of the agreement to each cardholder each year. As required by Regulation Z (12 C.F.R. sec. 226.9(c), petitioner notified cardholders when it changed the terms of the agreement.

The cardholder agreement provided, among other things, that: the annual membership fee was paid "in consideration of" the issuance of a card and the establishment of a credit limit, cardholders were required to surrender their cards upon demand, petitioner could cancel a card at any time, and the annual membership fee was nonrefundable. For example, petitioner's cardholder agreement, effective April 1981, stated in part as follows:

OTHER CHARGES. * * *

4.   You agree to pay a non-refundable annual membership fee of $15.00 in consideration of the issuance of your Card and the establishment of your credit limit.  The fee will be added to your purchase balance.  The fee will be effective April 1, 1981.  * * *[2]

CLOSING THE ACCOUNT.  Except where specific notice is required by law, we can close your Account at any time by phoning you or by writing you at the address shown on our records.  If you want to close your Account, you must give us notice in writing.  * * *

The agreement urges cardholders to read and retain a copy of the agreement because "when you use your Account, you've agreed to the terms in this agreement."

The agreement also states that the cardholder may use the card to buy goods and services wherever the card is honored and to get cash advances in various ways; that petitioner will send a periodic statement to the cardholder; that the cardholder should notify petitioner if the card is lost or stolen; that the cardholder may be liable for misuse of his or her card up to $50; that the cardholder has certain rights under the Fair Credit

---

[2] Similarly, petitioner's cardholder agreement and Truth-in-Lending Disclosure, effective September 1984, provided in part as follows:

OTHER CHARGES.  * * *

4.   You agree to pay a non-refundable annual membership fee of $15.00 in consideration of the issuance of your Card and the establishment of your credit limit.  The membership fee will be charged on your Periodic Statement each year in the month in which you opened your account.  For Commercial Accounts the annual membership fee will be $36.00.

Billing Act if there is a billing dispute; and that petitioner may change the cardholder agreement at any time.

5.  Petitioner's Credit Card Services and Business Practices

All of petitioner's MasterCard cardholders had available to them the following from 1983 to 1985:  Periodic itemized statements of account activity, toll-free customer telephone service, ATM access, prompt replacement of lost and stolen cards and fraud protection,[3] worldwide merchant acceptance, consumer protection for purchases (i.e., if a cardholder has a problem with goods or services bought with a credit card, he or she generally has the right not to pay the remaining amount due after trying in good faith to return the item or giving the merchant a chance to correct the problem), free additional cards, a means of identification, check access (petitioner provides checks bearing a cardholder's account number which the cardholder may use to buy goods or services from merchants not honoring the card), credit bureau reporting, processing of payments, changes in credit limits, and verification of available credit when cardholders used their cards.  Petitioner provided additional services to some of its cardholders:  travel, accident, and rental car insurance, rental car discounts, emergency cash or airline

---

[3] Under Regulation Z, 12 C.F.R. sec. 226.12(b), the cardholder may be required to pay the first $50 of unauthorized use, but petitioner rarely did so.  Petitioner asked MasterCard cardholders who had unusual activity on their cards if their card was lost or stolen.

tickets, and credit card registration.  Petitioner provided most of these services before it imposed an annual membership fee. Petitioner provided some services only if the cardholder used the card to make a specific purchase, e.g., free collision insurance with the rental of a car. Some of these services increased in value after petitioner imposed the annual membership fee, e.g., the amount of accident insurance.  Petitioner provided these services year-round, although use of them varied seasonally.

Petitioner generally issued new MasterCards to its cardholders every 2 years.  Petitioner reissued cards evenly throughout the year.  Reissuance of a card did not necessarily coincide with the date petitioner charged the annual membership fee.

Petitioner established a customer's MasterCard credit limit when petitioner approved a customer's application for the account.  Thereafter, petitioner occasionally changed the credit limit at a cardholder's request.  Petitioner sometimes raised credit limits to accommodate cardholders and sometimes lowered credit limits to reduce petitioner's risk.  Credit limit changes were not related to the charging and payment of the annual membership fee.

6.  Petitioner's Reporting of the Annual Membership Fees

Petitioner reported the annual membership fees it received from 1983 to 1985 ratably over a 12-month period for Federal

income tax, financial, accounting, and regulatory reporting purposes. Petitioner reported about 50 to 75 percent of the annual membership fees it received each year and deferred the balance to the next year. Petitioner reported the deferred portion as income in the following year for tax, financial, and regulatory purposes.

7. <u>Joint Venture Agreement</u>

On March 26, 1986, petitioner and Fidelity Bank & Trust Co. (Fidelity) signed a joint venture agreement under which: (a) Fidelity agreed to market petitioner's MasterCards to some of its customers, (b) petitioner agreed to service the accounts (send periodic statements, receive and process payments, handle merchant charge authorizations, respond to customer inquiries, etc.), and (c) Fidelity and petitioner agreed to divide any profits earned on the accounts. Petitioner estimated its servicing costs based on its actual 1985 costs of servicing MasterCard accounts and its budgeted 1986 costs. Under the agreement, petitioner received a monthly servicing fee of $2 per month per account or $24 per year for the first 12 months. After the first 12 months, upon 60 days' notice to Fidelity petitioner could raise the monthly servicing fee to cover actual increases in expenses in servicing the accounts.

OPINION

1.   Rev. Proc. 71-21, 1971-2 C.B. 549

Petitioner argues that, under Rev. Proc. 71-21, 1971-2 C.B. 549, it may report its income from annual membership fees ratably over a 12-month period on the grounds that the fees were for services it performed ratably over that period.

Income must be reported in the taxable year in which the taxpayer receives it, unless, under the taxpayer's method of accounting, the item of income is properly accounted for in a different period.  Sec. 451(a).  Petitioner is an accrual method taxpayer.  An accrual method taxpayer recognizes income when all the events have occurred which fix the right to receive the income and the amount of the income can be determined with reasonable accuracy.  Schlude v. Commissioner, 372 U.S. 128, 137 (1963); secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs.

Under Rev. Proc. 71-21, supra, an accrual basis taxpayer that receives payments in one taxable year for services to be performed not later than the next taxable year may, in certain circumstances, include the payments in gross income ratably as earned through the performance of the services, rather than when received.  Rev. Proc. 71-21, supra at 549-550, 1971-2 C.B. 549, states in part:

Section 1.  Purpose

    The purpose of this Revenue Procedure is to implement an administrative decision, made by the Commissioner in the exercise of his discretion under

section 446 of the Internal Revenue Code of 1954, to allow accrual method taxpayers in certain specified and limited circumstances to defer the inclusion in gross income for Federal income tax purposes of payments received (or amounts due and payable) in one taxable year for services to be performed by the end of the next succeeding taxable year. Amounts due and payable are, for purposes of this Revenue Procedure, treated as payments received.

Section 2.   Background

In general, tax accounting requires that payments received for services to be performed in the future must be included in gross income in the taxable year of receipt.  However, this treatment varies from financial accounting conventions consistently used by many accrual method taxpayers in the treatment of payments received in one taxable year for services to be performed by them in the next succeeding taxable year. The purpose of this Revenue Procedure is to reconcile the tax and financial accounting treatment of such payments in a large proportion of these cases without permitting extended deferral in the time of including such payments in gross income for Federal income tax purposes.  Such reconciliation will facilitate reporting and verification of such items from the standpoint of both the taxpayers affected and the Internal Revenue Service.

Section 3.   Permissible Methods

.01  An accrual method taxpayer who receives a payment for services to be performed by him in the future and who includes such payment in gross income in the year of receipt is using a proper method of accounting.

.02  An accrual method taxpayer who, pursuant to an agreement (written or otherwise), receives a payment in one taxable year for services, where all of the services under such agreement are required by the agreement as it exists at the end of the taxable year of receipt to be performed by him before the end of the next succeeding taxable year, may include such payment in gross income as earned through the performance of the services, subject to the limitations provided in sections 3.07, 3.08, and 3.11.  However, if the inclusion in gross income of payments received is

properly deferred under the preceding sentence and for any reason a portion of such services is not performed by the end of the next succeeding taxable year, the amount allocable to the services not so performed must be included in gross income in such next succeeding year, regardless of when (if ever) such services are performed.

* * * * * * *

.06 In any case in which an advance payment is received pursuant to an agreement which requires the taxpayer to perform contingent services, the amount of an advance payment which is earned in a taxable year through the performance of such services may be determined (a) on a statistical basis if adequate data are available to the taxpayer; (b) on a straight-line ratable basis over the time period of the agreement if it is not unreasonable to anticipate at the end of the taxable year of receipt that a substantially ratable portion of the services will be performed in the next succeeding taxable year; or (c) by the use of any other basis that in the opinion of the Commissioner, results in a clear reflection of income.

* * * * * * *

.11 The amount of any advance payment includible as gross receipts in gross income in the taxable year of receipt by a taxpayer under the foregoing rules shall be no less than the amount of such payment included as gross receipts in gross income for purposes of his books and records and all reports (including consolidated financial statements) to shareholders, partners, other proprietors or beneficiaries and for credit purposes.

2. <u>Whether Petitioner Performed Services for Cardholders Ratably Over 12 Months</u>

Petitioner points out that it performed many services for its MasterCard cardholders throughout the year and contends that it earned income from annual membership fees ratably over the 12-month period covered by those fees. We disagree with petitioner's contention.

The cardholder agreement states that the annual membership fee is nonrefundable and is paid in consideration of opening an account and establishing a credit limit.  Petitioner performed all of the acts that it was required to perform in order to be entitled to the annual membership fee when it issued a credit card to the customer and established a credit limit.  Petitioner does not deny that it can cancel a member's credit card at any time, or that its rights and obligations are anything other than as stated in the cardholder agreement.  Once petitioner opened an account for a customer, petitioner had an unrestricted right to that customer's annual membership fee.  Petitioner had no duty under the agreement to return any part of the fee even if petitioner or the cardholder closed the account immediately thereafter.

Petitioner contends that it received the annual membership fee in payment for numerous services it provided to cardholders throughout the year.  Petitioner's contention might be well taken if we disregard the cardholder agreement.  Under the agreement, all that petitioner was required to do to be entitled to keep the nonrefundable annual membership fee was to issue a card and establish a credit limit.  Respondent contends that those actions are not within the scope of Rev. Proc. 71-21, 1971-2 C.B. 549, because they are not services.  We need not decide respondent's

contention because, even if they are services, they are clearly not provided ratably over the 12-month period.[4]

Petitioner views the annual membership fee as paid for the various cardholder services. Petitioner contends that the cards would be useless if it did not provide services such as authorization of purchases, sending of statements, processing of payments, responding to cardholder questions, and replacing lost or stolen cards. We agree, but the cardholder agreement, written by petitioner, clearly states the payment is for something other than those services.

Petitioner argues that many services are "contemplated" by the agreement. Petitioner points out that the agreement states that the cardholder may use the card to buy goods and services wherever the card is honored and to get cash advances in various ways; that petitioner will send a periodic statement to the cardholder; that the cardholder should notify petitioner if the card is lost or stolen; that the cardholder may be liable for misuse of his or her card up to $50; that the cardholder has certain rights under the Fair Credit Billing Act if there is a

---

[4] We do not decide whether annual membership fees must be reported in the year of receipt if they are governed by cardholder agreements which differ substantially from the ones at issue here. As stated, the cardholder agreement at issue here provides that the fee is nonrefundable and is paid in consideration of issuance of the card and establishment of a credit limit, and the card may be canceled at any time by petitioner or the cardholder. Cf. Barnett Banks of Florida, Inc. v. Commissioner, 106 T.C. ___ (1996), filed today.

billing dispute; and that petitioner may change the cardholder agreement at any time. However, the cardholder has no assurance that those services will continue; petitioner can cancel the card at any time without refunding the annual membership fee.

Similarly, petitioner argues that it should be allowed to defer reporting the fees at issue here because they are called "annual membership fees". We disagree because the name of the fee does not override (nor does petitioner contend that it overrides) the provisions of the agreement that establish the rights and obligations of the parties.

Petitioner argues that respondent's reliance on the cardholder agreement improperly places form over substance. Under petitioner's argument, the "substance" of the transaction is that petitioner provides many services for cardholders throughout the year, and the "form" of the transaction is found in the cardholder agreement. We disagree. The cardholder agreement establishes the rights of cardholders and the card issuer. It provides that the payment is in consideration of the issuance of the card and establishment of a credit limit. An accrual method taxpayer recognizes income when all of the events have occurred which fix the right to receive the income. Secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs. Contrary to petitioner's contention, the rights and obligations of the parties are the substance of the matter. Even though petitioner urged cardholders to read and retain a copy of the agreement

(because "when you use your Account you've agreed to the terms in this agreement"), petitioner in effect argues here that it is not so important after all.

Petitioner points out that Rev. Proc. 71-21, supra, says that services must be provided by the close of the taxable year following the year of payment and that it does not say that the agreement must require services to be performed in the later year. Petitioner's point is literally true, but it is at best misleading. First, to allow deferral of reporting of income to a time later than all the events occurred which fix the taxpayer's right to receive the income is contrary to undisputed accrual accounting principles. See secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs. Second, Rev. Proc. 71-21, supra, allows income to be reported in the next taxable year "as earned through the performance of * * * services". Rev. Proc. 71-21, sec. 3.02. It is inherent in this language that petitioner must show that the payment was made at least in part for services to be performed in the next taxable year. See also id. secs. 1 and 2. As discussed above, the cardholder agreement clearly establishes that this is not the case here.

Petitioner reissued credit cards evenly throughout the year, and reissuance did not necessarily coincide with the date petitioner charged the annual membership fee. However, petitioner has not shown that one of the acts for which the annual membership fee was paid--the issuance of a card--occurred

after payment of the fee.  On the contrary, the required act--the issuance of a card--probably always or almost always occurred before payment of the annual membership fee.  An example may help to illustrate this point.  Assume petitioner issues a new card on March 1 and bills for the annual membership fee on October 1. In that situation, issuance of the card precedes payment of the annual membership fee.  Thus, when the fee is paid, petitioner has already performed one of the acts required by the cardholder agreement, lending no support to reporting the income after the petitioner receives the fee.  The same point would apply if the card were issued for more than 1 year, as was petitioner's general practice for MasterCards.

Now assume petitioner does not issue a card to a new customer until after the customer pays the annual membership fee. In that case, assuming that issuance of a card is a service under Rev. Proc. 71-21, supra, petitioner might not be required to report the fee income until it issues the card because it is an act required by the cardholder agreement.  This latter example has no bearing on this case, however, because petitioner did not show (or try to show) that it delayed initial issuance of a credit card until after it received annual membership fees from any customers.

Petitioner argues that, under section 3.06(b) of Rev. Proc. 71-21, supra, it may treat the annual membership fee as earned ratably over the membership year because it was "not unreasonable

to anticipate at the end of the taxable year of receipt that a substantially ratable portion of the services will be performed in the next succeeding taxable year". Sec. 3.06(b) of Rev. Proc. 71-21, supra at 549. Petitioner argues that most of the services it provides are contingent on whether a cardholder uses a card.

We disagree that petitioner qualifies under section 3.06(b) of Rev. Proc. 71-21, supra. That section applies if a taxpayer receives an advance payment pursuant to an agreement which requires the taxpayer to perform contingent services on a continuing basis in order to earn the payment. Sec. 3.06, Rev. Proc. 71-21, supra. The cardholder agreement does not require petitioner to perform contingent services of that kind. It requires petitioner to issue a card and establish a credit limit. Once petitioner does those things, petitioner may close an account at any time.

Petitioner cites Cozine & Showfety, "Advance Payments for Goods and Services", 2 Tax Adviser 602 (1971); and Sobeloff, "New Prepaid Income Rules: IRS Reversal of Position Will Aid Many Taxpayers", 33 J. Taxn. 194 (1970). These articles are useful discussions of Rev. Proc. 70-21, 1970-2 C.B. 501, and Rev. Proc. 71-21, supra, but they do not give any reason for us to agree with petitioner on the issue in dispute here.

Petitioner points out that respondent has ruled that the merchant discount earned by a bank operating a credit card plan is service income which a cash basis bank should include in

income as payments when received from cardholders on their accounts, Rev. Rul. 78-40, 1978-1 C.B. 136, and which an accrual method bank should include in income as it makes remittances to the merchants. Rev. Rul. 71-365, 1971-2 C.B. 219. Those rulings are entirely consistent with our holding here because they require cash basis banks to report income when received and accrual basis banks to report income under the all events test.

3. Relationship to Regulatory and Financial Accounting

Petitioner reported annual membership fees ratably over 12-month membership years for financial accounting, shareholder reporting, and regulatory reporting purposes from 1981 through the years in issue. Petitioner contends that this treatment is authorized for banks that charge periodic fees to credit card holders by an audit guide prepared by the Banking Committee of the American Institute of Certified Public Accountants and by Instructions to the Consolidated Reports of Condition and Income (Call Reports) issued in 1983 by the Federal Financial Institutions Examination Council for use by the three Federal banking agencies, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency. Petitioner argues that its reporting for those purposes supports its identical reporting for income tax purposes. We disagree. Petitioner's deferral of cardholder income for financial accounting, regulatory, or other purposes does not determine the proper Federal income tax

treatment.  <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522, 540-541 (1979).  Although generally accepted accounting practices may generally be used for tax accounting purposes, the taxpayer's use of a method of accounting is "expressly limited to cases where the Commissioner believes that the accounts clearly reflect the net income."  <u>Lucas v. American Code Co.</u>, 280 U.S. 445, 449 (1930); see <u>American Auto. Association v. United States</u>, 367 U.S. 687, 693 (1961).  A transaction need not be characterized the same for financial accounting purposes and for tax purposes. <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 577 (1978).

To reflect concessions,

<u>Decision will be entered under Rule 155</u>.