106 T.C. No. 4


UNITED STATES TAX COURT


BARNETT BANKS OF FLORIDA, INC. AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16295-93.                    Filed February 29, 1996.


        P, an accrual basis taxpayer, is in the banking business and
issues credit cards.  P charges its cardholders an annual
membership fee that entitles the cardholder to, inter alia, use
of the card with participating merchants, free replacement of
lost or stolen cards, 24-hour access to P's customer service
staff, and withholding of payment of disputed charges.  P has the
right to cancel the credit card at any time, but, if the card is
cancelled, the annual fee is refunded ratably for the number of
months remaining in the 1-year period.
        1.  Held, the annual membership fees constitute payments for
services rendered or made available to cardholders rather than
payments in the nature of additional interest or loan commitment
fees.
        2.  Held, further, under Rev. Proc. 71-21, 1971-2 C.B. 549,
P may report the annual membership fees in income ratably over
the 12-month period after receipt.

Philip C. Cook, Terence J. Greene, Timothy J. Peaden, and Ben E. Muraskin, for petitioner.

James F. Kearney and Joyce C. Albro, for respondent.

PARKER, Judge:  Respondent determined deficiencies in petitioner's Federal income tax as follows:

| Tax Year Ended | Deficiency |
|---|---|
| December 31, 1972 | $1,299 |
| December 31, 1976 | 112,652 |
| December 31, 1978 | 379,041 |
| December 31, 1980 | 1,694,423 |
| December 31, 1981 | 961,212 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:  (1) Whether annual credit card fees received by petitioner in the taxable years 1980 and 1981 constitute payments for services rendered or made available to its cardholders or payments for extension of credit in the nature of additional interest or loan commitment fees; and (2) if the annual fees represent payments for services, whether petitioner is entitled under Rev. Proc. 71-21, 1971-2 C.B. 549, to defer income from the annual fees received in one taxable year for services to be performed by the end of the next taxable year; or, stated another way, whether respondent, in denying petitioner the benefits of Rev. Proc. 71-21, abused her discretion in

determining that petitioner's method of accounting for prepaid annual credit card fees does not clearly reflect income.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts and the exhibits attached thereto are incorporated herein by this reference.

Throughout its 1980 taxable year and to the present, Barnett Banks of Florida, Inc., has been the parent corporation of various subsidiary bank corporations and nonbank corporations in Florida. References to petitioner will be to Barnett Banks of Florida, Inc., and its subsidiaries in the collective. Petitioner's principal place of business was in Jacksonville, Florida, at the time it filed the petition in this case. During 1980 and 1981, petitioner computed its taxable income under the accrual method of accounting, on a calendar year basis.

Petitioner's Credit Card Program

Petitioner began its bank credit card program in 1968. During 1980 and 1981, and other years not at issue, the

---

[1] The parties agree that petitioner's charitable deductions for taxable years 1978 and 1981 should be computed after taking into account all adjustments to petitioner's taxable income made by respondent and the Court affecting those years; i.e., those deductions will be determined in the Rule 155 computation resulting from this opinion. Similarly, the amounts of the net operating loss carryovers, investment tax credit, and minimum tax for the years at issue will be computed during the Rule 155 proceedings. Petitioner does not dispute respondent's other adjustments.

subsidiary bank corporations (issuing banks) issued Visa cards[2] to customers who qualified for the cards.

To apply for a card, a customer would complete a credit card application at the branch office of an issuing bank. The issuing bank's credit department would review the application and decide whether to issue a card to the applicant and, if so, the amount of the credit limit for that account. Once the card was issued, the cardholder could use the card to charge the cost of goods and services provided by merchants who accept payment by Visa card (merchants). Cardholders agreed to surrender their cards upon demand, and petitioner could cancel their cards at any time for almost any reason.

Cardholders received new cards annually. If a card was lost or stolen, petitioner would replace it at no additional charge. If the card was stolen, petitioner would issue a new card, and the cardholder's liability for any charges resulting from the theft of the old card, if any, was limited to $50. If the cardholder had a problem with the quality of a product or service purchased with the card, under certain conditions, the cardholder may have had the right not to pay the remaining amount due on that product or service. The cardholder could deduct disputed

_____

[2] During 1980 and 1981, a small number of Mastercard credit cards were outstanding. For purposes of convenience we refer to Visa cards or just cards; however, all references to Visa or cards apply to both Visa and Mastercard credit cards. The proposed adjustment relates to annual fees charged to both Mastercard and Visa cardholders.

amounts from the balance, pending resolution of the dispute, when calculating the minimum monthly payment due to petitioner.

A convenience user is a cardholder who uses the card to purchase goods and services, but pays off the entire balance each month, thereby avoiding any finance charges (interest). During 1980 and 1981, approximately 35 percent of petitioner's cardholders were convenience users. During the taxable years 1980 and 1981, the issuing banks charged those cardholders who did not pay off their entire balance each month interest at the annual rate of 18 percent on their outstanding (revolving) balances. This was the maximum rate allowed under Florida law.

Each merchant would submit its Visa sales receipts (sales drafts) either to the issuing subsidiary bank or to another bank with which the merchant had a Visa merchant account relationship (merchant bank); the merchant received payment from the bank in the amount of the sales drafts less the applicable merchant discount.[3] The merchant discount was equal to a set percentage of the total charges. Petitioner determined the merchant's discount percentage based on the merchant's projected annual sales and the estimated costs of the merchant's participation in the Visa program. If the merchant bank was not the cardholder's issuing bank, the merchant bank would sell the sales draft to the

---

[3] The sales receipts or sales drafts were treated like deposits of cash into the merchant's bank account, less of course the merchant discount.

issuing bank through the Visa interchange; the amount paid by the issuing bank to the merchant bank was the amount of the sales draft less an interchange fee. The issuing bank charged the cardholder the full amount of the sales draft.

In 1980 and 1981, Barnett Credit Services, Inc. (BCS), a nonbank subsidiary of Barnett Banks of Florida, Inc., performed various services for the subsidiary banks, and hence for the cardholders and merchants, with respect to Visa cards: card issuance, credit authorization, accounting, data processing, billing services, investigation of problem charges resulting from lost or stolen cards, and planning and marketing support functions. None of these functions was performed by the subsidiary banks themselves.[4] BCS offered customer assistance 24 hours a day. BCS was a nonprofit center with respect to the subsidiary banks, passing on the costs incurred. The subsidiary banks paid BCS on a monthly basis according to a fixed schedule

---

[4] BCS, in turn, contracted with National Data Corporation (NDC) to provide the credit authorization services to the banks' merchant clients. BCS charged the banks for this service at NDC's rates.

based on the type and number of functions provided.[5]  BCS also

provided many of these services to banks other than petitioner's

---

[5]  BCS charges the following fees to the banks (charges are per item (transaction) unless otherwise noted):

| Function | Charge to Subsidiary Banks | Charge to Other Banks |
|---|---|---|
| Fixed (per month) | --- | $1,000.00 |
| Data entry | | |
| Merchant deposit, paper | $0.045 | $0.050 |
| Merchant deposit, electronic | .020 | .025 |
| Interbank in | .020 | .025 |
| Interchange in | .020 | .025 |
| Payments | .035 | .040 |
| Cardholder | | |
| Accounts on file (per account) | .150 | .150 |
| Accounts billed (per account) | .170 | .200 |
| Plastic preparation | | |
| Conventional/mag strip | .250 | .250 |
| Photo | .400 | .400 |
| Merchant | | |
| Accounts on file (per account) | .150 | .150 |
| Accounts billed (per account) | .050 | .050 |
| Marketing (per account) | .025 | n/a[1] |
| Systems Support (per account) | .071 | n/a |
| Customer Service (per account) | .085 | n/a |
| Bank accounting (per account) | .020 | n/a |
| Merchant deposit processing (per transmittal) | .050 | n/a |
| Fraud/security (per report) | 23.500 | n/a |
| Optional services | | |
| Merchant plate preparation | .300 | .300 |
| Merchant plastic preparation | .400 | .400 |
| Late notices | .060 | n/a |
| First use notices | .060 | n/a |

[1] Services marked "n/a" were not offered to the other banks.

subsidiaries, but charged higher fees to the other banks.  See supra note 5.  BCS did not track costs by individual cardholder.

Beginning on October 1, 1980, petitioner started to charge each cardholder an annual membership fee (sometimes referred to simply as annual fee) of $15, irrespective of the cardholder's credit line, usage, or account balance, if any, carried over from month to month.  At that time, petitioner's major competitors were charging between $15 and $18 for such annual fees.  Normally, a customer could not become, or remain, a cardholder after October 1, 1980, without payment of the annual fee, although bank managers had discretionary authority to waive the annual fee for certain customers.  Those cardholders who chose to discontinue use of their cards on or before October 1, 1980, were not charged the annual fee and could pay off their existing balances in accordance with their previous agreements; no replacement cards were issued to such discontinuing cardholders.

For the years involved in this case and for some further period of time after the fee was instituted, the annual fee was refundable to the cardholder if the card was cancelled for any reason.[6]  The refund was a prorated amount of the annual fee, based on the number of months remaining in the 12-month period for which the annual fee was charged.

Also beginning in October of 1980, some new services for

---

[6]  By April of 1983 the annual fee became nonrefundable.

cardholders were added, which petitioner offered through the use of third-party providers. Petitioner provided loss-protection service whereby cardholders who lost their wallets or purses could notify the designated third-party provider, with whom they had listed all of their credit card accounts, and this company would contact all the card issuers. Petitioner made available life insurance in conjunction with the use of the card to purchase an airline ticket. Similarly, rental car insurance was provided when the cardholder charged the rental to the card.

The amount of the annual fee to be charged was limited by competitive factors in the industry. The annual fee did not cover the entire cost of serving the cardholders. During 1980 and 1981, petitioner's revenue with respect to the credit card program derived from four sources: (1) Merchant discounts, (2) interchange fees, (3) interest charges paid by cardholders with outstanding (revolving) balances, and (4) the annual fees paid by cardholders. In 1979, the year prior to the institution of the annual fee, 66 percent of petitioner's Visa revenue came from interest charges, 33 percent from merchant discounts and interchange fees, and the remaining 1 percent from other sources. The issuing banks have never placed any restrictions on their use of the annual fees for any corporate purpose.

Usual Banking Practices

Under ordinary commercial banking practices, borrowers of money are charged interest based on the amount of money borrowed.

Loan commitment fees are charged for the privilege of having a fixed sum of money available to be borrowed for a given period of time.  The amount of a loan commitment fee is almost always based on the amount of credit made available.

The banking industry normally and customarily treats annual credit card fees as service income, not as interest or loan commitment fees.  If annual fees were considered as interest and were then combined with finance charges on outstanding (revolving) balances, the total interest would have exceeded the maximum rate allowed under the usury laws of many States, including the State of Florida.  There is no correlation between the amount of the annual fee and the amount of the cardholder's credit line or outstanding balance.  Nor is there any commitment on the part of the issuing banks to make use of the card available for a given period of time, since the issuing banks may cancel the cards at any time.

For bank regulatory accounting purposes, banks are required to amortize the annual fees over the period to which the fees relate. These fees were excluded from the definition of finance charges under the Truth in Lending Regulations, 12 C.F.R. secs. 226.4 and 226.407, as in effect for 1980 and 1981.[7]

Petitioner's Accounting Method

For 1980 and 1981, petitioner's issuing banks recorded the

---

[7] 12 C.F.R. sec. 226.407 (1980) (special ed.) and 12 C.F.R. sec. 226.407 (1981) [special ed.].

annual fees in their books ratably over 12 months. When the annual fee was assessed, the issuing banks established a credit card receivable and made an offsetting credit entry to the deferred income account corresponding to the calendar month of the assessment. They then recognized the annual fees as income ratably over the ensuing 12-month period.[8]

For financial accounting purposes and bank regulatory accounting purposes, for the year 1980 and all years thereafter, petitioner ratably allocated its annual fees over 12 months. For Federal income tax purposes, for the taxable years 1980 through 1985, petitioner ratably allocated the annual fees over 12 months. Petitioner has maintained adequate books and records of the annual fees so that the amount deferred on its Federal income tax return for each of the taxable years 1980 and 1981 can be verified from such books and records.

Respondent determined that the annual fees assessed in taxable years 1980 and 1981 should be included in income in the year of receipt for Federal income tax purposes, and increased petitioner's income by $2,962,829 and $1,010,872, for 1980 and 1981, respectively. In addition, respondent adjusted petitioner's income for the taxable years 1976 through 1982 in accordance with a Schedule of Agreed Adjustments executed by petitioner on April 12, 1993. Respondent allowed petitioner a

---

[8] In Stipulation 16 the parties have set out the details of this accounting system.

net operating loss carryback from 1982 to 1980, adjusted the investment credit recapture for 1981, and recomputed the investment and other tax credits as well as the minimum tax for several of the taxable years from 1970 through 1982. Respondent's adjustments resulted in deficiencies in Federal income tax in the amounts of $1,299, $112,652, $379,041, $1,694,423, and $961,212 for the taxable years 1972, 1976, 1978, 1980, and 1981, respectively. Respondent mailed the notice of deficiency to petitioner on April 29, 1993, and petitioner timely filed its petition in this Court.

## OPINION

Petitioner argues that the annual credit card fee is a payment for services, and as such is eligible for partial deferral from the inclusion in income under Rev. Proc. 71-21, 1971-2 C.B. 549. Respondent's position is that the fee is not payment for services, but rather, is a payment "for membership in the card plan", which respondent then equates to an extension of credit in the nature of additional interest or a loan commitment fee. In the alternative, respondent argues that if the fee is for services, then petitioner's deferral does not clearly reflect income, and respondent's denial of the benefits of Rev. Proc. 71-21 was not an abuse of discretion. Respondent argues that in either view, Rev. Proc. 71-21 is not available to petitioner, and the fees must be included in income in the year of receipt.

Credit Card Fees as Payment for Services

Petitioner's credit card program provides benefits for both merchants and cardholders. Processing of the sales drafts involved merchant aspects and cardholder aspects. Transactions could be for either convenience users or cardholders with revolving balances. The merchants, the convenience users, and the revolving-balance users all were served by the operation of this integrated system. It is difficult to apportion the benefits of the plan to its specific users.

Petitioner derived its income from its credit card program from four sources: The merchants paid through the merchant discounts. Merchant banks (banks other than the subsidiary issuing banks) paid through the interchange fees. Cardholders with outstanding (revolving) balances paid interest for the use of that credit. All cardholders were charged the annual fee, and the amount of the annual fee was the same regardless of credit line, amount charged, or the amount of the outstanding balance, if any. It is similarly difficult to match any particular type of income with particular services performed by petitioner. See supra note 5.

Nevertheless, cardholders paid annual fees and received services. All cardholders were issued at least one plastic card each year and had the right to use that card, subject to cancellation by petitioner at any time. However, if petitioner cancelled the card, it refunded the annual fee on a pro rata

basis for the number of months remaining in the 1-year period.
Cardholders had the opportunity to use their cards for payment at
a large number of businesses, negating the risk of carrying large
amounts of cash or the restrictions on writing checks.
Cardholders had access to petitioner's customer service staff on
a 24-hour basis, and the right to withhold payment on disputed
charges.  We agree with petitioner that its cardholders remitted
the annual fees as payment for services.

Clear Reflection of Income

The general rule for the taxable year of inclusion of income
appears in section 451.  Section 451(a) requires that:

> The amount of any item of gross income shall be
> included in the gross income for the taxable year in
> which received by the taxpayer, unless, under the
> method of accounting used in computing taxable income,
> such amount is to be properly accounted for as of a
> different period.

Section 446(a) provides that "Taxable income shall be computed
under the method of accounting on the basis of which the taxpayer
regularly computes his income in keeping his books."  The accrual
method of accounting is one permissible method of computing
taxable income.  Sec. 446(c)(2).  Petitioner is an accrual basis
taxpayer and has kept its books regularly in accordance with this
method.  Section 1.446-1(c)(ii), Income Tax Regs. provides:

> Accrual method.  Generally, under an accrual
> method, income is to be included for the taxable year
> when all the events have occurred which fix the right
> to receive such income and the amount thereof can be
> determined with reasonable accuracy.  * * *

However, "merely because the method of accounting a taxpayer employs is in accordance with generally accepted accounting procedures, this 'is not to hold that for income tax purposes it so clearly reflects income as to be binding on the Treasury.'" Commissioner v. Idaho Power Co., 418 U.S. 1, 15 (1974) (quoting American Automobile Association v. United States, 367 U.S. 687, 693 (1961)). Financial accounting and income tax accounting methods have different objectives. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 542-543 (1979). As stated by the Supreme Court:

> The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. * * * Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable.

Id.. Nevertheless, "where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency and that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences." Commissioner v. Idaho Power Co., supra at 15 (fn. ref. omitted).

If the taxpayer's method of accounting does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income. Sec. 446(b). Respondent has broad

powers in determining whether accounting methods used by a taxpayer clearly reflect income.  Commissioner v. Hansen, 360 U.S. 446, 467 (1959).

Where accrual method taxpayers have received advance payments for services and have unrestricted access to those funds, courts have upheld respondent's determinations that these payments are to be included in income in the year of receipt. Schlude v. Commissioner, 372 U.S. 128 (1963); American Automobile Association v. United States, 367 U.S. 687 (1961);  Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957); RCA Corp. v. United States, 664 F.2d 881 (2d Cir. 1981); Angelus Funeral Home v. Commissioner, 407 F.2d 210 (9th Cir. 1969), affg. 47 T.C. 391 (1967); S. Garber, Inc. v. Commissioner, 51 T.C. 733 (1969); Popular Library, Inc. v. Commissioner, 39 T.C. 1092 (1963).  But cf. Artnell Co. v. Commissioner, 400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967); Boise Cascade Corp. v. United States, 208 Ct. Cl. 619, 530 F.2d 1367 (1976); Collegiate Cap & Gown Co. v. Commissioner, T.C. Memo. 1978-226.  While respondent focuses on such cases, particularly the Supreme Court's Schlude-American Automobile Association-Automobile Club of Michigan trilogy, petitioner does not challenge them. Petitioner instead relies upon exceptions thereto that respondent has chosen to make administratively.

Petitioner's case is squarely based on Rev. Proc. 71-21, 1971-2 C.B. 549, the use of which it says should be available to

it. Respondent's primary objection to petitioner's use of that revenue procedure is the argument that the annual credit card fees do not represent payments for services under the cardholder agreement, a factual issue we have resolved in petitioner's favor. Almost as an afterthought, respondent argues that petitioner's accounting method for these annual fees does not clearly reflect income, an argument based upon an insistence that Rev. Proc. 71-21 requires a matching of income and expense on an individual cardholder basis. Petitioner admittedly does not track the expenses for these services on an individual cardholder basis. Having then decided that the revenue procedure, as thus interpreted by respondent, does not apply to petitioner, respondent concludes there is thus no abuse of discretion in denying petitioner the use of Rev. Proc. 71-21. We think respondent's approach is inconsistent with the intended purpose and benefit of the revenue procedure, that petitioner's pro rata reporting of these fees over a 12-month period satisfies Rev. Proc. 71-21, and that respondent's denial of the benefits of the revenue procedure to petitioner amounts to an abuse of discretion.

In 1970, respondent issued Rev. Proc. 70-21, 1970-2 C.B. 501,

> to implement an administrative decision, made by the Commissioner of Internal Revenue in the exercise of his discretion under section 446 of the Internal Revenue Code of 1954, to allow accrual method taxpayers in certain specified and limited circumstances to defer

the inclusion in gross income for Federal income tax
purposes of payments received (or amounts due and
payable) in one taxable year for services to be
performed by the end of the next succeeding taxable
year. * * *

Rev. Proc. 70-21, sec. 1. The following year, respondent issued

Rev. Proc. 71-21, 1971-2 C.B. 549, which superseded Rev. Proc.

70-21, but incorporated the basic principles of the earlier

revenue procedure. Rev. Proc. 71-21, sec. 2, states:

In general, tax accounting requires that payments
received for services to be performed in the future
must be included in gross income in the taxable year of
receipt. However, this treatment varies from financial
accounting conventions consistently used by many
accrual method taxpayers in the treatment of payments
received in one taxable year for services to be
performed by them in the next succeeding taxable year.
The purpose of this Revenue Procedure is to reconcile
the tax and financial accounting treatment of such
payments in a large proportion of these cases without
permitting extended deferral in the time of including
such payments in gross income for Federal income tax
purposes. Such reconciliation will facilitate
reporting and verification of such items from the
standpoint of both the taxpayers affected and the
Internal Revenue Service. * * * [Emphasis added.]

Rev. Proc. 71-21, sec. 3.02, further provides that:

An accrual method taxpayer who, pursuant to an
agreement (written or otherwise), receives a payment in
one taxable year for services, where all of the
services under such agreement are required by the
agreement as it exists at the end of the taxable year
of receipt to be performed by him before the end of the
next succeeding taxable year, may include such payment
in gross income as earned through the performance of
the services * * *

The amount of the advance payment includable as gross receipts in

gross income in the taxable year of receipt must be no less than

the amount of such payments included for purposes of the

taxpayer's books and records and all reports to shareholders, partners, other proprietors or beneficiaries and for credit purposes. Rev. Proc. 71-21, sec. 3.11. Petitioner uses the same method for financial, regulatory, and tax accounting purposes and thus satisfies this requirement. Taxpayers who avail themselves of this procedure must maintain adequate books and records so that the amount deferred on the income tax return for any year can be verified. Rev. Proc. 71-21, sec. 4. The parties have stipulated that petitioner's books and records satisfy this requirement.

Petitioner relies on Rev. Proc. 71-21 for its method of accounting for these annual credit card fees. Section 3.14 of Rev. Proc. 71-21 provides that the deferral of income in accordance with this procedure will be treated as an acceptable method of accounting under section 446 as long as the method is consistently used by the taxpayer. Petitioner consistently used the same method of accounting for these fees from the time it instituted the fees in October of 1980 through the taxable year 1985.[9]

Respondent cites section 3.06 of Rev. Proc. 71-21 and argues that since petitioner has not correlated the fees to specific services, petitioner is unable to avail itself of Rev. Proc. 71-

_____

[9] Respondent seems to argue on brief that petitioner improperly changed its accounting method without obtaining respondent's consent. That is not the case.

21. Section 3.02 permits the taxpayer to include the payments in income "as earned through the performance of the services". Section 3.06 sets forth methods that may be used in determining the amount of an advance payment that is earned in a taxable year where the agreement requires the performance of contingent services. Section 3.06 reads:

> In any case in which an advance payment is received pursuant to an agreement which requires the taxpayer to perform contingent services, the amount of an advance payment which is earned in a taxable year through the performance of such services may be determined (a) on a statistical basis if adequate data are available to the taxpayer; (b) on a straight-line ratable basis over the time period of the agreement if it is not unreasonable to anticipate at the end of the taxable year of receipt that a substantially ratable portion of the services will be performed in the next succeeding taxable year; or (c) by the use of any other basis that in the opinion of the Commissioner, results in a clear reflection of income.

The language of section 3.06 instructs the taxpayer as to how to report the payments from contingent service agreements; it does not preclude such payments for contingent services from the application of Rev. Proc. 71-21. Also, examples 4 and 5 given in section 3.12 refer to contingent service providers and do not require a matching of the service contract income with performance of specific services.

We have found that the annual credit card fees were payments for services provided to or made available to the cardholders. The period of the agreement covered by the fee was 12 months; thus, all services would be performed within a 1-year period and

- 21 -

always by the end of the next succeeding taxable year.

Petitioner reported the annual fees in income on a pro rata basis over a 12-month period.  Since the full range of services, including contingent services performed on the cardholder's demand, would be available over the 12-month period for which the fee was paid, it would be "not unreasonable" to anticipate that a substantially ratable portion would be performed or available to be performed in whatever portion of the 1-year period remained at the end of any given taxable year.  The cardholder pays for services to be available at all times over the 1-year period of the agreement, whether or not the particular cardholder avails himself of those services.

Petitioner's pro rata inclusion of income over the 12-month period is reasonable and within the purview of Rev. Proc. 71-21. We think the revenue procedure does not require the type of matching of income and expense that respondent insists upon.  The revenue procedure permits accrual basis taxpayers to defer the inclusion in gross income of payments received (or due and payable) in one year for services to be performed by the end of the next succeeding taxable year.  Petitioner's method does that. The purpose of the revenue procedure was to reconcile tax and financial accounting treatment of such payments without permitting extended deferral beyond the end of the next succeeding taxable year.  Petitioner's method is that required for financial and regulatory accounting purposes; hence the

method reconciles financial and regulatory accounting with tax accounting and certainly without undue deferral. The purpose of this reconciliation is to "facilitate reporting and verification of such items from the standpoint of both the taxpayers affected and the Internal Revenue Service." Rev. Proc. 71-21, sec. 2. Petitioner's method does that. Respondent's demand for a matching of the fee income with the expenses incurred for specific services would impose an undue burden on petitioner. Finally, if the credit card is cancelled, petitioner makes a pro rata refund of the fee for the number of months remaining in the 1-year period. Thus, if anything, petitioner's method provides a more reasonable matching of income and expense than what respondent seems to espouse.[10]

We conclude that petitioner is eligible to defer its income from credit card fees under Rev. Proc. 71-21. Respondent has declared that deferral of income according to this revenue procedure is an acceptable method of accounting. Rev. Proc. 71-21, sec. 3.14.

Where respondent fails to observe self-imposed limits upon

---

[10] This case is factually distinguishable from Signet Banking Corp. v. Commissioner, 106 T.C. ___ (1996). The cardholder agreement in that case provided that the membership fee was nonrefundable and was paid in consideration of the issuance of the card and the establishment of the cardholder's credit limit. The agreement here was materially different. The annual fee was paid for services and was refundable to the cardholder on a pro rata basis if the card was cancelled for any reason during the 1-year period.

her exercise of discretion and has invited reliance upon such limitations, an abuse of discretion can occur.  <u>Capitol Fed. Sav. & Loan v. Commissioner</u>, 96 T.C. 204, 217 (1991).  We conclude that here respondent has abused her discretion in denying petitioner the use of Rev. Proc. 71-21.

In accordance with the above holdings,

<u>Decision will be entered</u>

<u>under Rule 155.</u>