**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SIGNET BANKING CORPORATION,
<u>Petitioner-Appellant,</u>

v.                                              No. 96-2429

COMMISSIONER OF INTERNAL REVENUE,
<u>Respondent-Appellee.</u>

Appeal from the United States Tax Court.
(Tax Ct. No. 92-7887)

Argued: June 2, 1997

Decided: July 8, 1997

Before WILKINSON, Chief Judge, and WILKINS and
MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Wilkins and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** William L. Goldman, MCDERMOTT, WILL &
EMERY, Washington, D.C., for Appellant. Teresa Thomas Milton,
Tax Division, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellee. **ON BRIEF:** Christopher Kliefoth,
Dianne Suarez-Lasa, MCDERMOTT, WILL & EMERY, Washing-
ton, D.C., for Appellant. Loretta C. Argrett, Assistant Attorney
Gen-
eral, Gilbert S. Rothenberg, Tax Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Signet Banking Corporation challenges the Commissioner's determination that the bank failed to properly report annual membership fee revenue from its credit card operations in the year it was received.
The Tax Court upheld the Commissioner. Signet Banking Corp. v. Commissioner, 106 T.C. 117 (1996). Signet now appeals, claiming that the fee income represented payment for services provided over the membership year and therefore qualified for partial deferral pursuant to Revenue Procedure 71-21, 1971-2 C.B. 549. We disagree. The nature of the fee and the terms of the cardholder agreement drafted by Signet make clear that the annual fee is paid solely for the issuing of a card and the establishment of a credit limit. While the Internal Revenue Code permits taxpayers to structure their economic affairs as they wish, they must then abide by the tax consequences. Accordingly, we affirm the judgment of the Tax Court.

I.

During the tax years at issue in this case, 1983 through 1985, Signet issued MasterCard and VISA credit cards. The bank offered a number of services to cardholders, including replacement of lost or stolen cards, payment processing, provision of periodic statements, and verification of credit to enable cardholders to make specific purchases. Prior to 1981, ninety percent of Signet's credit card revenue came from finance charges assessed when card users failed to pay off their monthly balance. Rising interest rates narrowed the gap between the bank's cost of funds and the finance charge it could legally impose to the point where, in 1980, Signet's credit card operation was losing money. In 1981, the bank imposed a flat annual membership fee of fifteen dollars which was charged to cardholders at the beginning of the twelve-month period covered by the fee.

Signet provided all new cardholders with a copy of the Customer Agreement, which described many of the various cardmember services. Under "OTHER CHARGES," the agreement stated:

2

4. You agree to pay a non-refundable annual membership fee of $15.00 in consideration of the issuance of your Card and the establishment of your credit limit. The membership fee will be charged on your Periodic Statement each year in the month in which you opened your account.

The agreement also permitted either the bank or the cardholder to cancel the card at any time.

Signet is an accrual method, calendar year taxpayer. For the tax years in question, the bank did not report annual fee income in the year of receipt but rather recognized it ratably over the twelve months covered by the fee. Thus, in the case of a cardmember who opened an account in July, Signet included half of the fee in income that same year and half in the succeeding year.

Following an audit, the Commissioner determined that under the tax accounting rules governing accrual method taxpayers, Signet should have reported all of the fee revenue in the year it was received. The bank challenged this determination in the Tax Court, arguing that the annual fee was compensation for cardholder services rendered throughout the membership year and that the fee income therefore qualified for partial deferral under an exception created by Revenue Procedure 71-21.

The Tax Court held that Signet could not rely on Revenue Procedure 71-21 because the cardholder agreement itself stated that the fee was not paid for services to be performed over time, but rather in consideration of issuing a card and establishing a credit limit. Signet Banking, 107 T.C. at 117. The court noted that the bank reserved the right to cancel the card at any time and that the bank "had no duty under the agreement to return any part of the fee even if [Signet] or the cardholder closed the account immediately" after it was activated. Id. at 127. Signet appeals.

II.

Accrual method taxpayers are generally required to recognize payments for future services as income in the year of receipt. See Schlude

3

_v. Commissioner_, 372 U.S. 128 (1963); _American Automobile Associ-_
_ation v. United States_, 367 U.S. 687 (1961). Revenue Procedure
71-21 provides an exception to this rule "in certain specified and
lim-
ited circumstances." The Procedure permits taxpayers to partially
defer income received in one tax year for services to be performed
over a period ending no later than the conclusion of the next tax
year.
The portion which may be deferred is the portion attributable to
those
services which are to be performed during the following tax year.

Signet argues that its annual membership fee income qualified for
partial deferral under Revenue Procedure 71-21 because the fee
repre-
sents payment for card services provided to cardholders over the
membership year. The bank asserts that the credit cards are useless
without payment processing, credit verification, and the other
services
explicitly or implicitly provided for in the cardholder agreement.
It
concludes that "[n]o one would pay a $15.00 annual membership fee
for . . . an inert piece of plastic."

This observation, however, is immediately countered by several
others which are far less favorable to Signet's position. To begin
with,
the fee that Signet charges is a flat one, taking no account of a
partic-
ular cardmember's actual use of the card. Such usage varies
dramati-
cally -- some cardholders do very little with their cards, while
others
take advantage of the full spectrum of available benefits. The
record
also suggests that the fee is not even calculated to cover the
aggregate
cost of providing card services. Signet's financial reports provide
no
correlation between the fee income and the expense of providing
such
services. Moreover, we note the coincidence in timing whereby the
annual fee was imposed shortly after Signet's credit card
operations
became unprofitable. Indeed, William Binns, Executive Vice Presi-
dent of Signet's Bank Card Division at the time, testified that the
bank began considering an annual fee precisely because "[i]n 1980,
the bank card business . . . was losing money." Taken together,
these
facts suggest that the annual fee represented a general revenue
raising
measure as opposed to an attempt to charge users for the cost of
ser-

vices rendered.

The terms of the cardholder agreement itself also do not link the fee to services provided over the membership year. Under "OTHER CHARGES," Part 4, the agreement clearly states:"You agree to pay

4

a non-refundable annual membership fee of $15.00 <u>in consideration of the issuance of your Card and the establishment of your credit limit</u>." (emphasis added). This is classic contract language, drafted by Signet itself, and it requires the bank to do no more than complete the discrete tasks enumerated to earn the fee. Whether services or not, those tasks are certainly not services to be provided over time and therefore cannot bring the fee income within the terms of Revenue Procedure 71-21.

While the distinction between issuance of a card and the provision of card services may be an artificial one, as Signet contends, it is a distinction created by Signet. The Supreme Court"has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to fol-low but did not." <u>Commissioner v. National Alfalfa Dehydrating & Milling Co.</u>, 417 U.S. 134, 149 (1974) (citations omitted).

Signet also objects to the Tax Court's reliance on the fact that the fee was non-refundable and the card could be cancelled at any time by the bank or the cardholder. The Tax Court suggested that these provisions permitted Signet to cancel the card and keep the fee with-out providing any services other than issuing a card and establishing a credit limit. <u>Signet Banking</u>, 106 T.C. at 127. Signet argues that this reasoning is flawed because the implied covenant of good faith imposed by Virginia law would prevent the bank from arbitrarily can-celling an account and retaining the fee.

Signet's argument misses the mark. The implied covenant would have no impact in the vast majority of cases where either the card-holder cancels the card or the bank has cause to close the account. Furthermore, the bank simply cannot structure the terms of the card-holder agreement to its advantage and then rely on an indeterminate question of Virginia law to evade the federal tax implications thereof.

None of Signet's arguments change either the nature of the fee or the terms of the cardholder agreement, and the bank is bound accord-ingly under the Internal Revenue Code.

III.

Signet insists finally that we must take account of the fact that the
fee is denominated an "annual membership" fee. The bank argues,
"the fee is paid for `membership' in the Signet MasterCard plan. That
plan entails all of the Cardmember Services contemplated by the
Cardmember Agreement," not just issuance of a card and establish-
ment of a credit limit. In particular, the bank asserts that use of the
term "annual" indicates that the payment is for services to be provided
throughout the membership year. Mere labelling, however, cannot
alter the substance of the fee arrangement as established by the con-
siderations previously noted. For obvious reasons, a taxpayer's classi-
fication of its own transaction cannot determine the appropriate tax
treatment. See Commissioner v. Court Holding Co., 324 U.S. 331,
334 (1945).

Revenue Procedure 71-21 represents an attempt to balance the
straightforwardness of a report-upon-receipt requirement with some
sense of fairness to taxpayers receiving payment for services rendered
by the close of the succeeding tax year. The Procedure, however, is
a strictly limited exception. It does not sanction open-ended efforts to
fine-tune fairness, a step that would threaten to sacrifice the benefits
of simplicity entirely. The Commissioner is correct to underscore the
presumption that accrual method taxpayers are to recognize payments
for future services as income when those payments are received. Rev-
enue Procedure 71-21 represents a limited exception to this rule, one
for which the annual fee income at issue does not qualify. Accord-
ingly, the judgment of the Tax Court is affirmed.

AFFIRMED